CASE NO. 15-2346/2486

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOHN DOES, #1-5; MARY DOE

*Plaintiffs-Appellants/Cross-Appellees,*

-vs-

RICHARD SNYDER, Governor of the State of Michigan; COL. KRISTE ETUE, Director of the Michigan State Police, in their official capacities,

*Defendants-Appellees/Cross-Appellants.*

**On appeal from the United States District Court**
**for the Eastern District of Michigan**

---

# BRIEF OF FAMILY DEFENSE ATTORNEYS OF MICHIGAN AS *AMICI CURIAE* SUPPORTING THE PLAINTIFFS-APPELLANTS/CROSS-APPELLEES

---

Liisa R. Speaker (P65728)
Speaker Law Firm PLLC
230 N Sycamore St
Lansing, MI 48933-1094
(517) 482-8933
lspeaker@speakerlaw.com

Amanda S. Alexander (P77795)
University of Michigan Law School
701 S. State St.
Ann Arbor, MI 48109
(734) 763-5000
alexanas@umich.edu

Evelyn K. Calogero (P45512)
Evelyn K. Calogero PLLC
215 N Main St
Olivet, MI 49076-9465
(269) 749-9600
evelyn@olivetlawyer.com

Attorneys for *Amicus Curiae* Family Defense Attorneys of Michigan

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**Disclosure of Corporate Affiliations and Financial Interest**

Case Number: 15-2346/2486 Case Name: *Does v. Snyder*

Name of counsel: Liisa Speaker

Pursuant to 6th Cir. R. 26.1, Family Defense Attorneys of Michigan
*Name of Party*
make the following disclosures:

1. Are any of these parties a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on January 11, 2016, the foregoing document was served on all parties or their counsel of record through the MC/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Liisa Speaker

## TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFLIATIONS AND FINANCIAL INTEREST ……………………………………………………..……..ii

TABLE OF CONTENTS ……………………………………………………iii

TABLE OF AUTHORITIES ……………………………………………….....iv

INTEREST OF AMICUS CURIAE ……………………………………………1

SUMMARY OF ARGUMENT …………………………………………………2

ARGUMENT ……………………………………………………………………3

I. SORA violates the fundamental right to participate in the education and upbringing of one's children..……………………………………….3

II. SORA hinders the ability of parents to engage in the rearing of their children and damages their children's education outcomes……………..6

III. Sex offender registries' geographic exclusion zones and loitering provisions harm the health and well-being of children of registrants..…10

IV. Sex offender registries limit where children can live, putting them at risk of homelessness…………………………………………………14

V. Registries harm families for no rational reason given that there is no evidence that registries reduce the risk or prevalence of sex crimes..…16

CONCLUSION ……………………………………………………………..18

CERTIFICATE OF COMPLIANCE ………………………………………..19

CERTIFICATE OF SERVICE ……………………………………………...19

## TABLE OF AUTHORITIES

**Cases**

*Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015)……………………….5,6
*Lassiter v. Dep't Soc. Servs.,* 452 U.S. 18 (1981)...……………..……………..4
*McKune v. Lile*, 536 U.S. 24 (2002) ……………………………..…....…16
*Meyer v. Nebraska,* 262 U.S. 390 (1923) ……………………………………4
*Pierce v. Society of Sisters,* 268 U.S. 510 (1925) ……………………………4
*Stanley v. Illinois,* 405 U.S. 645 (1972) ……………………………………4
*Troxel v. Granville,* 530 U.S. 57 (2000) ……………………………….……..4
*Washington v. Glucksberg,* 521 U.S. 702 (1997) ……………………………4

**Statutes**

M.C.L. §28.721 *et seq* ………………………………………………...... 2,3,5
42 U.S.C. §16901 *et seq*...…………………………………………………… 3

**Other Authorities**

Calif. Dept. of Corrections and Rehabilitation, *2014 Outcome Evaluation Report* (2015) ……………………………………………………………...16
Carpenter, *Throwaway Children: The Tragic Consequences of a False Narrative,* SSRN (2015)………………………………………………………11
Ellman *et al., 'Frightening and High': The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015)…………………16
Farkas *et al., Reentry and Reintegration: Challenges Faced By the Families of Convicted Sex Offenders,* 20 Fed. Sent. Rep. 88 (2007)……………………17
Frenzel *et al., Understanding Collateral Consequences of Registry Laws: An Examination of the Perceptions of Sex Offender Registrants,* 11 Just. Pol. J. 1 (2014)……………………………………………………..10,12,13
Hanson *et al., High-Risk Sex Offenders May Not Be High Risk Forever*, 29 J. Interpers. Violence 2792 (2014)…………………………………………16
Horowitz, *Protecting Our Kids? How Sex Offender Laws Are Failing Us* (2015)………………………………………………………………….…11
Lancaster, *Sex Panic and the Punitive State* (2011)…………………………...10,11
Langan *et al., Recidivism of Sex Offenders Released from Prison in*

*1994*, NCJ 198281 (2003)……………………………………………………..16
Levenson *et al., Collateral Damage: Family Members of Registered Sex Offenders*, 34 Am. J. Crim. Just. 54 (2009)…………………………...8,10,11,14
Levenson *et al.*, *The Effect of Megan's Law on Sex Offender Reintegration*, 21 J. Contemp. Crim. Just. 49 (2005)…………………………13
Levenson *et al.*, *The Impact of Sex Offender Residence Restrictions: 1,000 Feet from Danger or One Step from Absurd?*, 49 Int'l. J. Offender Therapy & Comp. Criminology 168 (2005)………………………...15
Mapp, *Title 1 and Parent Involvement: Lessons from the Past, Recommendations for the Future* (2011)……………………………..……6
Mapp *et al.*, *Partners in Education: A Dual Capacity-Building Framework for Family-School Partnerships* (2014)…………………………………....7
Pittman, Human Rights Watch, *Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the U.S.* (2013)…….……………………………………………….…....11,12
Quinn *et al*., *Societal Reaction to Sex Offenders: A Review of the Origins and Results of the Myths Surrounding Their Crimes and Treatment Amenability*, 25 Deviant Behavior 215 (2004)………………………………...10
Sheldon *et al*., *The Family Engagement Partnership: Student Outcome Evaluation* (2015)……………………………………………….…………7
Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J. Contemp. Crim. Just. 67 (2005)……….………………………………13
Tewksbury *et al.*, *Prohibiting Registered Sex Offenders from Being at School: Assessing the Collateral Consequences of a Public Policy*, 7 Just. Pol. J. 1 (2010)…………………………………………………17
Tewksbury *et al.*, *Stress Experiences of Family Members of Registered Sex Offenders,* 27 Behavioral Sci. & L. 611 (2009)…………….…………..17
Zevitz *et al.*, *Sex Offender Community Notification: Assessing the Impact in Wisconsin* (2000)…………………………...……….……...13,14

## INTEREST OF AMICUS CURIAE

Family Defense Attorneys of Michigan ("FDAM") respectfully submits this *amicus curiae* brief in support of plaintiff-appellants/cross-appellees in *Does v. Snyder*.[1]

FDAM is an organization comprised of attorneys who advocate for families, typically representing parents in child welfare proceedings. FDAM members strive to promote family preservation through zealous legal advocacy, quality attorney representation, and community education. FDAM seeks to preserve and protect the fundamental liberty interest of parents in the care, custody, and control of their children. Founded in 2013, FDAM counts among its members attorneys from 13 counties across the state of Michigan.

FDAM member attorneys have worked with parents and family members who are inhibited in their ability to raise their families because of the requirements of sex offender and child welfare registries. FDAM members witness the impacts that registries have on the children of registrants. The Court's decision in this case will have a significant impact on Michigan families who are subjected to registry restrictions. FDAM has a strong interest in ensuring that the Court examines high-quality social science research about the impact of registries on the children of registrants.

---

[1] This brief is submitted with the consent of all parties.

## SUMMARY OF ARGUMENT

Sex offender registries are supposed to protect children, but in fact registries can harm children, namely the children of registrants. For the past 15 years social scientists have studied the collateral consequences faced by registered sex offenders and their families. Recent studies show that registries negatively impact the education, health, and well-being of children who must endure the consequences of their parent's registration.

Michigan's Sex Offender Registry Act ("SORA"), M.C.L. §28.721, *et seq.*, violates the fundamental right to participate in the education and upbringing of one's children, resulting in negative outcomes for children of parents who are required to register. SORA's geographic exclusion zones and loitering provision hinder the ability of parents to engage in the rearing of their children and damage their children's education outcomes. SORA also negatively affects a child's ability to engage in school activities.

Children of registrants experience stigma from their peers, teachers, and other adults because of their parent's status. Research indicates that children of registrants are shunned, depressed, and harassed. Registries also limit where children can live, putting them at risk of homelessness. Finally, registries harm families for no rational reason given that there is no evidence that registries reduce the risk or prevalence of sex crimes. While there is little evidence to show that

registries help to protect children from sexual abuse, ample evidence shows that registry laws have unintentionally victimized the children of registrants.

## ARGUMENT

### I. SORA violates the fundamental right to participate in the education and upbringing of one's children.

First enacted in 1994, sex offender registries have evolved from private databases only available to law enforcement to public registries and systems of state control that restrict nearly every part of a registrant's life. Michigan's SORA restricts where registrants may live, loiter, or work, requires registrants to report their whereabouts, and requires law enforcement to make certain information about registrants available to the public through the internet. M.C.L. §28.721, *et seq*. In 2011, SORA was amended in line with the federal Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. §16901 *et seq*., to require lifetime registration for several tiers of crimes. M.C.L. §§28.725(10)-(13). SORA's tier classifications are now based only on a registrant's offense and do not allow for individualized determination of risk.

The plaintiffs in the instant case are all parents who are required to register under SORA. They include, for example, a man who had a sexual relationship with a 14-year-old when he was 19 in 1998. While Mr. Doe #3 was originally required to register for 25 years on a non-public registry, after the 2011 amendments to the law, he is now required to register as a sex offender for life. He is subject to

lifetime restrictions on where he can live, loiter, and work that inhibit his ability to parent his three children. Joint Statement of Facts (JSOF) ¶95-122, R. 90, Pg.ID#3747-3752. Through no fault of their own, his children are deprived of their father's role in many aspects of their upbringing. As his wife states, "At times I feel like I'm a single parent because he can't help me even if he wanted to, which he does." *Id.* ¶555, R. 90, Pg.ID#3860.

The United States Supreme Court has made clear that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Lassiter v. Dep't Soc. Servs.,* 452 U.S. 18, 27 (1981) ("[A] parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" [quoting *Stanley v. Illinois,* 405 U.S. 645, 651 (1972)]). Parents also have a fundamental right to direct the education and upbringing of their children. *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) (citing *Meyer v. Nebraska,* 262 U.S. 390 [1923]; *Pierce v. Society of Sisters,* 268 U.S. 510 [1925]).

Plaintiffs in the instant case testified to being unable to attend their children's parent-teacher conferences, JSOF ¶521, R. 90, Pg.ID#3852, athletic events, *Id.* ¶555, R. 90, Pg. ID#3860, talent shows and school plays, *Id.* ¶559, R.

90, Pg.ID#3861, and graduations, *Id.* ¶577, R. 90, Pg.ID#3867, because of SORA's requirements. SORA prohibits registrants from "loitering" in student-safety zones. The Act defines "loiter" as "remain[ing] for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors," M.C.L. §28.733(b), and "student safety zone" as "the area that lies 1,000 feet or less from school property," M.C.L. §28.733(f). SORA does not include an exemption for parental activities. As a result, the loitering ban inhibits parents from engaging in many activities closely related to the upbringing of their children. Because school safety zones cover much of a city, SORA also prevents parents from accompanying their children to parks, *Id.* ¶556, R. 90, Pg.ID#3861, playgrounds, *Id.* ¶560, R. 90, Pg.ID#3862, and other establishments. ¶565, R. 90, Pg.ID#3864. Mr. Doe #4 summarized the limits that his status as a registrant places on his parenting: "I want to be involved with my kids' stuff but it's impossible." *Id.* ¶565, R. 90, Pg.ID#3864.

The district court found that "ambiguity in the exclusion zones and in the term 'loiter' leave registrants of ordinary intelligence unable to determine what behavior is prohibited by SORA. Due to SORA's vagueness, it is unclear whether a registrant may visit a public library or attend a parent-teacher conference where minors are present without risking arrest from law enforcement." *Doe v. Snyder*, 101 F. Supp. 3d 672, 698 (E.D. Mich. 2015). The court acknowledged the dilemma

that parents face in trying to interpret and abide by SORA's restrictions, yet it failed to declare whether SORA violates the fundamental right to parent. Declining to rule, the district court stated that "SORA's vagueness leaves the court unable to determine to what extent SORA infringes on Plaintiff's right to participate in the upbringing and education of their children, or whether SORA is narrowly tailored to achieve that interest." *Id.* at 699.

While the State has a compelling interest in protecting minors from abuse, it must narrowly tailor its laws to survive strict scrutiny. As it stands, SORA's vagueness has confounded the district court and leaves registrant parents uncertain and afraid to exercise their right to parent for fear of arrest. JSOF¶536, R. 90, Pg.ID#3855 (Mr. Doe #2: "After I found out that schools were – I mean, it's so cloudy to what I can and can't do that once I read schools were off limits in some sort of way or another I left it alone altogether because I did not want to risk my freedom . . ."). Such lack of clarity and broad infringement on the right to parent does not comport with the Constitution.

## II. SORA hinders the ability of parents to engage in the rearing of their children and damages their children's education outcomes.

Children benefit from parental involvement in their education. Mapp, *Title 1 and Parent Involvement: Lessons from the Past, Recommendations for the Future,* 1 (2011) ("More than five decades of research confirms that the engagement of families in their children's education improves school readiness, student academic

outcomes such as higher gains in reading and math achievement, and graduation rates.") Research consistently links family engagement in a child's education with indicators of student achievement including student grades, achievement test scores, lower drop-out rates, students' sense of personal competence and efficacy for learning, and students' beliefs about the importance of education. Mapp *et al.*, *Partners in education: A dual capacity-building framework for family-school partnerships*, 5 (2014); *see also* Sheldon *et al*., *The Family Engagement Partnership: Student Outcome Evaluation*, 4 (2015) ("[T]he link between family engagement and student and school success is well established . . . ."). The children of registrants are denied many of these benefits because of SORA's restrictions.

SORA severely impedes a parent's ability to raise and educate their children because the prohibition against loitering in student-safety zones prevents them from accompanying and observing their own children in many essential activities in their lives. Since the loitering prohibition does not include a limited exemption for parental activities, parents are inhibited in their ability to attend their children's parent-teacher conferences, athletic events, school plays, or graduations. Mr. Doe #3 has missed out on activities with his children such as field trips, and he cannot attend other school activities like movie nights, math nights, bingo nights, open house/meet the teacher, talent shows, musicals, concerts or plays. JSOF¶559, R. 90, Pg.ID#3861. Mr. Doe #2 does not participate in his daughter's school or

sporting events. *Id.* ¶¶528-42, Pg.ID#3854-56. Mr. Doe #3 does not take his children to school because the family does not know whether he could be arrested. *Id.* ¶¶543-61, Pg.ID#3856-62. Ms. Doe could not attend her daughter's eighth grade graduation or school plays. Id. ¶¶576-86, Pg.ID#3866-69.

Such experiences are the norm for families subjected to sex offender registries. The plaintiff's experiences accord with the findings of social science research. In a landmark 2009 survey of nearly 600 immediate family members of sex offender registrants by Levenson *et al.*, a majority (74%) of respondents indicated that the registered sex offender parent had been unable to participate in some of the child's activities, such as attending school plays or other events, attending or participating in the child's organized sports, or attending the child's birthday party. Levenson *et al.*, *Collateral Damage: Family Members of Registered Sex Offenders*, 34 Am. J. Crim. Just. 54, 63 (2009).

SORA's vagueness leaves registrant parents so unsure about what they can and cannot do that some do not even contact their children's schools for fear this could be a violation. Because registrant parents do not contact their children's schools out of fear of violating SORA, their children cannot reap all the benefits of parental involvement in their education. Mr. Doe #1 cannot attend his future step-daughter's school and extra-curricular events. He does not contact her teachers due to fear of violating his registry requirements and thereby "subjecting my family

[to] losing me again." JSOF¶532, R. 90, Pg.ID#3855. Mr. Doe #2 has not attempted to contact his daughter's school since he started registering as a sex offender, and has not attempted to telephone or e-mail his daughter's principal or teachers. *Id.* ¶537, R. 90, Pg.ID#3855. Mr. Doe #2 has limited his involvement in his daughter's education "because I did not want to risk my freedom." *Id.*¶536, R. 90, Pg.ID#3855.

SORA also negatively affects a *child*'s ability to engage in school activities. Mr. Doe #4's daughter cannot participate in evening school activities because her father cannot attend them and her mother's work schedule prevents her from taking her. JSOF ¶566, R. 90, Pg.ID#3864. Children are also placed at a disadvantage if their parent cannot fully assist them with being prepared for school. As Mr. Doe #3's wife testified, "If my son forgets his backpack at home [my husband] can't take it to him." JSOF ¶544, R. 90, Pg.ID#3857.

Apart from the loitering provisions, parents indicated other negative school-related experiences because of a parent's status on the registry. Mr. Doe #3's wife expressed concern about their son's future participation in the sex ed curriculum in middle school because the class involves searching the registry. JSOF¶561, R. 90, Pg.ID#3862. These experiences resonate with trends reflected in social science research about the educational experiences of children of registrants. More than half (58%) of respondents in Levenson *et al.*'s 2009 study said that the child of a

registrant was treated differently by other children at school. Levenson *et al., Collateral Damage* at 63. 63% of respondents said that the child had been treated differently by other adults, including teachers, and 71% said that the child had been stigmatized due to the parent's registered sex offender status (71%). *Id*.

### III. Sex offender registries' geographic exclusion zones and loitering provisions harm the health and well-being of children of registrants.

Sex offender registration carries a great deal of stigma for people on the registry and their families. Research has found that "many people in society respond to sex offenders based on commonly held, yet unsubstantiated beliefs and myths rather than research and facts." Frenzel *et al., Understanding Collateral Consequences of Registry Laws: An Examination of the Perceptions of Sex Offender Registrants,* 11 Just. Pol. J. 1, 2 (2014); *see also* Quinn *et al*., *Societal Reaction to Sex Offenders: A Review of the Origins and Results of the Myths Surrounding Their Crimes and Treatment Amenability*, 25 Deviant Behavior 215 (2004). Such beliefs provided the impetus for SORN laws, and people who must register under those laws experience "resentment, stigmatization, harassment, and assault." Frenzel *et al.* at 2. Roger Lancaster and others have suggested that sex offender registries result in no less than "social death" for registrants because they are "explicitly stigmatized, literally unwanted, and pushed out by society." Horowitz, *Protecting Our Kids? How Sex Offender Laws Are Failing Us*, 61

(2015) (citing Lancaster, *Sex Panic and the Punitive State*, 103 [2011]). The children of registrants also experience this social banishment, with negative consequences for their health and well-being.

Children of registrants are shunned, depressed, and harassed because of their parent's status. In Levenson's 2009 survey of nearly 600 immediate family members of registrants, two-thirds reported that their children felt left out of activities because of their parent's status, more than three-quarters said their children were depressed, and almost half reported that their children were harassed. Levenson *et al*. *Collateral Damage*. Levenson's study found that the children of registered sex offenders are reported to exhibit anger (80%), depression (77%), anxiety (73%), feeling left out by peers (65%), and fear (63%). Additionally, more than one in eight (13%) of the children of registered sex offenders were reported to exhibit suicidal tendencies. *Id.* at 63-4. *See also*, Carpenter, *Throwaway Children: The Tragic Consequences of a False Narrative,* SSRN (2015),16 (finding that children of registrants attest to being isolated and losing friends because they have a parent on the registry).

A 2013 Human Rights Watch report also found that "offender registration laws can have especially harmful impacts on the children of registrants." Nicole Pittman, Human Rights Watch, *Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the U.S.*, 61 (2013). In discussing

the stigmatization, violence, and harassment that children of registrants experience, the report highlights the case of a teenage girl in Texas who shot herself to death after she experienced embarrassment at school because her father's photo appeared on the state internet registry. *Id.* at 62. Human Rights Watch also relayed the firsthand account of a girl whose father is on the sex offender registry:

> I would like to take the time to tell you what it is like to be a child of a [registered] sex offender. I wake up every morning wondering how many [sex offender] signs may be on our front lawn; how many people are going to ride by our house, point, and take pictures; how many people are going to watch every move we make today; and how many times people are going to call the police to report that my parent has done something for which an average person would be normal but because my parent is a known 'Sex Offender' its suspicious behavior[;] how many more birthdays will be with just family because other parents will not let their kids come to my party; how many parties will I not be invited to; how many more sports games will my parent not be allowed to watch me play; and how many field trips will I not attend because it is too hard to listen to the whispers of the other parents?

*Id.* at 63-4. Frenzel *et al.* found that children of registrants were commonly shunned by their friends and friends' parents. Frenzel *et al., Understanding Collateral Consequences* at 14. In response to an open-ended question about the negative consequences that their family experiences as result of their status, registrant parents wrote: "[p]arents don't want their children to play with my children;" "[my children were not] invited for play dates or birthday parties;" "[my] children suffer the most . . . they lose friends;" "People pick on my children." *Id.* at 14.

For the past 15 years social scientists have studied the collateral consequences faced by registered sex offenders and, more recently, by their families. *See e.g.*, Tewksbury (2005), *Collateral Consequences of Sex Offender Registration*, J. Contemp. Crim. Just., 21(1), 67-81; Levenson *et al.* (2005), *The Effect of Megan's Law on Sex Offender Reintegration*, 21 J. Contemp. Crim. Just. 49 (2005); Zevitz *et al.*, *Sex Offender Community Notification: Assessing the Impact in Wisconsin* (2000). In 2014, Frenzel and a team of researchers sought to build upon earlier work by compiling existing studies and conducting new surveys with registrants in Pennsylvania, Texas and Wisconsin. Frenzel *et al., Understanding Collateral Consequences*. Based on a sample of 443 respondents, Frenzel found that registered sex offenders experience similar treatment across geographic locales and that there are wide collateral consequences on the families of registrants. Frenzel drew the following conclusion: "Sex offender registries were implemented, in part, to keep society safe by attempting to raise awareness and reduce victimization and suffering. It appears that the children, spouses, friends, and neighbors of the registered sex offenders in this sample are suffering. These people—all members of society—are the unintended victims of registry laws." *Id.* at 15-16. In a similar vein, Mr. Doe #3 testified that it was important for him to get off the registry so he could give his children (a fourth grader, a first grader, and an infant) a normal life: "Most important thing is my children. I feel like my children

are getting tried with me. I feel like they're the victims." JSOF ¶543, R. 90, Pg.ID#3856-57.

### IV. Sex offender registries limit where children can live, putting them at risk of homelessness.

The difficulties registrants face in finding housing are well documented. *See e.g.,* Tewksbury *et al.*, *Prohibiting Registered Sex Offenders from Being at School: Assessing the Collateral Consequences of a Public Policy*, 7 Just. Pol. J. 1, 6 (2010) ("The most commonly documented collateral consequences affecting [registered sex offenders] are difficulties finding housing and/or being forced to move as a result of registration and residence restrictions."); Zevitz *et al., Sex Offender Community Notification* (interview of 30 registered sex offenders in Wisconsin found that 83% reported difficulties in finding or maintaining a residence). Because registries limit where their parents can live, registries also limit where children can live and put them at risk of homelessness. Levenson *et al.*, *Collateral Damage* at 63. In Levenson *et al.*'s survey of nearly 600 immediate family members of sex offender registrants, 40% said they had found it hard to find an affordable place to live. *Id*. Levenson *et al.* found that approximately 50% of registrants in their study could not live with supportive family members. Levenson *et al.*, *The Impact of Sex Offender Residence Restrictions: 1,000 Feet from Danger or One Step from Absurd?,* 49 Int'l. J. Offender Therapy & Comp. Criminology 168 (2005).

In the instant case, Mr. Doe #4, his wife I.G., and their two children have been unable to live together because he is on the registry. JSOF ¶562, R. 90, Pg.ID#3862; Doe #4 Second Declaration, R.116, Pg.ID#6012 (stating that Mr. Doe #4 and I.G. married in June 2015. JSOF describes I.G. as Mr. Doe #4's girlfriend [and the former victim in his case], but they are now married). Although I.G. has looked into dozens of properties in different neighborhoods, and although she has access to leasing-agent property lists (she has worked as a leasing agent for four years and manages approximately 1,800 apartments), the only places she can find where the family could live together are in dangerous neighborhoods or high-rent areas. Quite a few properties are in prohibited zones, while others will not accept registrants. I.G. could get a 15% rent discount at her employer's complex, but as a registrant Mr. Doe #4 is unable to live there. *Id.* Mr. Doe #4 is unable to live with his family and is homeless. *Id.* ¶569, R. 90, Pg.ID#3865. I.G. testified that because the family cannot live together, it means "we're not together in the sense where we can, you know, always have dinner together or help with my daughter's homework, things like that." *Id.* ¶564, R. 90, Pg.ID#3864.

## V. Registries harm families for no rational reason given that there is no evidence that registries reduce the risk or prevalence of sex crimes.

While sex offender registries have been justified based on a presumed "frightening and high risk of recidivism" among sex offenders, *McKune v. Lile,*

536 U.S. 24, 34 (2002), this presumption is not born out by research. Ellman, *et al.*, *'Frightening and High': The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015). To the contrary, several studies have shown that the recidivism rate for sex offenses is quite low. A Bureau of Justice Statistics study of over 9,600 sex offenders released in 15 states found that only 3.5% were reconvicted for a sex offense within three years. Langan *et al.*, *Recidivism of Sex Offenders Released from Prison in 1994*, NCJ 198281 2 (2003). Last year, the California Corrections Department examined cases of sex offender registrants who returned to prison and found that less than 1% had committed a new sex offense. Calif. Dept. of Corrections & Rehabilitation, *2014 Outcome Evaluation Report* (2015). Among low-risk offenders, 97.5% were offense-free after five years, and about 95% were still offense-free after 15 years. Hanson, *High-Risk Sex Offenders May Not Be High Risk Forever*, 29 J. Interpers. Violence 2792, T.2 (2014). Other studies show that released sex offenders are less likely to commit a new felony of any kind—not just a sex offense—after release than are other released felons. *Id.* at 2. Despite a lack of evidence to support the utility of registries, children of registrants continue to endure the consequences of their parent's registration.

Finally, registries—and the stress they put on families—may make it harder for people convicted of sex offenses to successfully re-enter and reintegrate into

the community. Family members play an integral role in the process of re-socialization for people convicted of sex offenses after they are released from incarceration. Farkas *et al., Reentry and Reintegration: Challenges Faced By the Families of Convicted Sex Offenders,* 20 Fed. Sent. Rep. 88 (2007). Tewksbury *et al.* have found that higher stress for family members means less time helping a registered sex offender with their process of reintegration. Tewksbury *et al., Stress Experiences of Family Members of Registered Sex Offenders,* 27 Behavioral Sci. & L. 611 (2009). Tewksbury *et al.* argue that "when [registered sex offenders] are restricted from being able to fully engage in their roles as parents, through activities such as attending school functions, being involved in their children's school activities and going about 'normal' parenting activities both they and their children are likely to experience increased stress, and successful community re-entry may be inhibited." Tewksbury *et al., Prohibiting Registered Sex Offenders* at 9. Thus there is some indication that sex offender registries may be counterproductive to the goal of successful re-entry and reintegration, particularly because of the strain they place on families of people convicted of sex offenses. While there is little evidence to show that registries help to protect children from sexual abuse, ample evidence shows that registry laws cause severe unintended harm to thousands of children and families.

## CONCLUSION

For the foregoing reasons, the court should find that SORA violates plaintiffs' fundamental right to parent. SORA's "loitering" prohibition should be enjoined facially as applied to all registrants. Because not only plaintiffs and their families, but other registrants and their families, suffer from SORA's facially unconstitutional provisions, those should be enjoined as to all registrants.

Respectfully submitted,


s/Liisa Speaker
Liisa R. Speaker (P65728)
Speaker Law Firm PLLC
230 N Sycamore St
Lansing, MI 48933-1094
(517) 482-8933
lspeaker@speakerlaw.com

s/Amanda Alexander
Amanda S. Alexander (P77795)
University of Michigan Law School
701 S. State St.
Ann Arbor, MI 48109
(734) 763-5000
alexanas@umich.edu

s/Evelyn Calogero
Evelyn K. Calogero (P45512)
Evelyn K. Calogero PLLC
215 N Main St
Olivet, MI 49076-9465
(269) 749-9600
evelyn@olivetlawyer.com

Attorneys for *Amicus Curiae* Family Defense Attorneys of Michigan


Dated: January 11, 2016

Institutional affiliations are listed for identification purposes only.

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word counting feature of counsel's word processing programs shows that this brief contains 4,277 excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/ Liisa Speaker*
Liisa Speaker (P65728)
Attorney for *Amicus Curiae* Family
Defense Attorneys of Michigan

## Certificate of Service

This brief will be served on January 11, 2016, on all counsel of record via the Court's ECF system.

*s/ Liisa Speaker*
Liisa Speaker (P65728)
Attorney for *Amicus Curiae* Family
Defense Attorneys of Michigan