CASE NO. 15-2346/2486

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOHN DOES, #1-5; MARY DOE

*Plaintiffs-Appellants/Cross-Appellees,*

-vs-

RICHARD SNYDER, Governor of the State of Michigan; COL. KRISTE ETUE, Director of the Michigan State Police, in their official capacities,

*Defendants-Appellees/Cross-Appellants.*

**On appeal from the United States District Court**
**for the Eastern District of Michigan**

---

# *AMICI CURIAE* BRIEF OF THE ASSOCIATION FOR THE TREATMENT OF SEXUAL ABUSERS, CITIZENS ALLIANCE ON PRISONS AND PUBLIC SPENDING, HUMAN RIGHTS DEFENSE CENTER, MICHIGAN CHAPTER OF THE NATIONAL ASSOCIATION OF SOCIAL WORKERS, MICHIGAN COUNCIL ON CRIME AND DELINQUENCY, NORTHWEST INITIATIVE, OHIO JUSTICE AND POLICY CENTER, PROFESSIONAL ADVISORY BOARD TO THE COALITION FOR A USEFUL REGISTRY, AND THE SENTENCING PROJECT

---


/s/ Douglas Mullkoff (P33252)
Kessler, Mullkoff & Hooberman LLP
402 West Liberty
Ann Arbor, MI 48103
(734) 761-8585
doug@kmhlaw.com

s/ Alexandra S. Appatova
Ohio Justice and Policy Center
215 E. 9th Street, Suite 601
Cincinnati, OH 45202
(513) 421-1108 x20
sappatova@ohiojpc.org

/s/ Barbara R. Levine (P24207)
Citizens Alliance on Prisons
and Public Spending
824 N. Capitol Ave.,
Lansing, MI 48906
(517) 482-7753
blevine@capps-mi.org

Counsel for *Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**Disclosure of Corporate Affiliations and Financial Interest**

Case Number: 15-2346/2486 Case Name: *Does v. Snyder*

Name of counsel: Barbara Levine, Douglas Mulkoff, Sasha Appatova

Pursuant to 6th Cir. R. 26.1, The Association For The Treatment Of Sexual Abusers, Citizens Alliance On Prisons And Public Spending, Human Rights Defense Center, Michigan Chapter Of The National Association Of Social Workers, Michigan Council On Crime And Delinquency, Northwest Initiative, Ohio Justice and Policy Center, Professional Advisory Board To The Coalition For A Useful Registry, and The Sentencing Project

*Name of Party*

make the following disclosures:

1. Are any of these parties a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on January 11, 2016, the foregoing document was served on all parties or their counsel of record through the MC/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Douglas Mullkoff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ........................................................................ 6

ARGUMENT ........................................................................ 8

I. Michigan's sex offender registry is not rationally designed for its intended purpose because it rests on misconceptions about sexual offenses and offenders that have been soundly refuted by a large body of research. ............ 8

A. People convicted of sex offenses are a heterogeneous group that present widely different risks of re-offending and warrant individualized treatment that recognizes these differences. ............ 9

B. Re-offense rates for those convicted of sex offenses are actually very low. ............ 14

C. Recidivism risk decreases over time, making decades-long registration requirements and geographic exclusions pointless. ............ 19

D. Geographic restrictions do not reduce offenses against children because most such offenses are committed within the child's residence. ............ 20

E. SORA registration and notification requirements do not reduce the number of sexual offenses because the majority are committed by first offenders known to the victims. ............ 22

II. SORA's vague and broad-based restrictions and requirements have unfairly damaging collateral consequences for former offenders, their families and the community. ............ 26

III. Michigan's sex offender laws expend considerable taxpayer dollars and law enforcement resources in an inefficient and counterproductive manner. ............ 31

Attachments

A. Professional Advisory Board Membership List

B. Michigan Department of Corrections Memorandum

## TABLE OF AUTHORITIES

### Cases

*Doe v. Sex Offender Registry Brd.*, 41 N.E.3d 1058 (Mass. 2015) ........................11
*Poe v. Granholm*, 1:10-cv-318 (W.D. Mich. 2010).............................................29

### Statutes

M.C.L. 28.721a. .........................................................................................9

### Other Authorities

Adkins, G., et al., Iowa Department of Human Rights, *The Iowa sex offender registry and recidivism.* (2000)........................................................................25
Am. Corr. Ass'n, *Resolution on Neighborhood Exclusion of Predatory Sex Offenders* (Jan. 24, 2007)..........................................................................30
Association for the Treatment of Sexual Abusers, "Sex Offender Registration & Notification" ........................................................................................25
Barnoski, *Sex Offender Sentencing in Washington State: Recidivism Rates* (Washington State Institute for Public Policy (2005)...........................................15
California Sex Offender Management Board, *Recidivism of Paroled Sex Offenders – A Ten(10)Year Study* (2008); California Sex Offender Management Board, *Recidivism of Paroled Sex Offenders – A Five (5) Year Study* (2008) ...............................................................................15
Citizens Alliance on Prisons & Public Spending, *Denying parole at first eligibility: How much public safety does it actually buy? A study of prisoner release and recidivism in Michigan* (2009) .........................................15
Citizens Alliance on Prisons and Public Spending, *10,000 fewer Michigan prisoners: Strategies to reach the goal* (2015)..................................................33
Citizens Alliance on Prisons and Public Spending, *Programs for sex, assaultive offenders: an update,* Consensus (Fall, 2011) ....................................13
Colorado Dep't of Public Safety, Division of Criminal Justice, *Report on safety issues raised by living arrangements for and location of sex offenders in the community* (2004) ............................................................ 22, 26
Finkelhor et al., National Center for Missing and Exploited Children, *Nonfamily Abducted Children: National Estimates and Characteristics* (2002).........................................................................................................22
Flaherty, *Recidivism in Pennsylvania State Correctional Institutions, 1997-2003,* Pennsylvania Department of Corrections (2005)..............................16
Hanson & Morton-Bourgon, *Predictors of Sexual Recidivism: An Updated Meta-Analysis* (2004)................................................................................10

Hanson et al., *High Risk Sex Offenders May Not Be High Risk Forever,* 29 J. of Interpersonal Violence, no. 15 (Oct. 2014) ....................................19
Hanson et al., *The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis,* 36 Criminal Justice and Behavior 865-891 (2009)....................................................................................11
Harris & Hanson, *Sex offender recidivism: A simple question,* Report, Public Safety Canada (2003) ........................................................... 19, 32
Holley and Ensley, *Recidivism Report: Inmates Released from Florida Prisons, July 1995 to June 2001,* Florida Department of Corrections (2003) .....16
Horowitz, *Protecting Our Kids? How Sex Offender Laws are Failing Us* (2015) .....................................................................................................28
Howard, *Hazards of different types of reoffending*, UK Ministry of Justice Research Series (2011) .............................................................................19
Huebner et al, *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri* (2013) at 9 (orig. emph) ......................................21
Human Rights Watch, *No Easy Answers, Sex Offender Laws in the U.S.,* vol. 19, no. 4(G), 62 (September 2007)..............................................................28
Indiana Department of Correction, *Recidivism Rates Compared: 2005-2007* (2009)..........................................................................................................15
Iowa County Attorneys Association, *Statement On Sex Offender Residency Restrictions In Iowa*, December 11, 2006 ..................................................36
Iowa Department of Corrections, Iowa Recidivism Report: *Prison Return Rates FY 2013* (March 2014)......................................................................16
J. Bonta & D.A. Andrews, Public Safety Canada, *Risk-Need-Responsivity model for offender assessment and rehabilitation* (2007)..................................10
J.J. Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?* 54 J.L. & Econ 161-206 (2011).......................25
Justice Policy Institute. *What Will It Cost States to Comply with the Sex Offender Registration and Notification Act?*.......................................................35
Kohl et al, *Massachusetts Recidivism Study:A Closer Look at Releases and Returns to Prison,* Urban Institute, Justice Policy Center (Washington, D.C., 2008) ..................................................................................................16
Kruttschnitt, Candace, et al., *Predictions of Desistance Among Sex Offenders: The Interactions of Formal and Informal Social Controls,* 17 Just. Quarter., No. 1, 67-87 (2000).........................................................................................27
Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?,* 5 Criminology & Pub. Pol. 483 (2006)....................19
Langan et al, *Recidivism of Sex Offenders Released from Prison in 1994,* U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C., 2003)............................................................................................15

Legislative Services Bureau Report on SORA 2013 (Pl. Exh. 92) .........................33
Levenson & Cotter, *The Impact of Sex Offender Residency Restrictions: 1000 Feet from Danger or One Step from the Absurd?* 49 Int'l J. of Offender Therapy and Comp Criminology168 (2005) .......................................................27
Levenson & Tewksbury, *Collateral Damage: Family Members of Registered Sex Offenders*, 34 American Journal of Criminal Justice 54-68, 65-66 (2009) ...28
Levenson and Shields, *Sex Offender Risk and Recidivism in Florida* (2012).........15
Levenson, Jill & Leo Cotter, *The Effects of Megan's Law on Sex Offender Reintegration*, 21J. Contemp. Crim. Just., 298-300 (2005) .................................28
Maine Statistical Analysis Center, USM Muskie School of Public Service, *Sexual Assault Trends and Sex Offender Recidivism in Maine* (2010) ................15
Matson, S., & Lieb, R, Washington State Institute for Public Policy, *Community notification in Washington State: A 1996 survey of law enforcement. Olympia*, WA: (1996) ..................................................................25
Memorandum from MDOC Deputy Directors Thomas Finco, Charles Sinclair and Randall Treacher to Correctional Facilities Administration and Field Operations Staff, *RE: Risk Based Prisoner Program Referrals-UPDATED* (June 11, 2012)...............................................................................................12
Michigan Department of Corrections, *2013 Statistical Report* ..............................33
Michigan Incident Crime Reporting (MICR), 2014 CSC – First Degree ...............20
Michigan State Police SORA Conviction Data (Exh. 46, pages 2-3) .....................32
Minnesota Dep. of Corr., *Level three sex offenders residential placement issues* (2003) ....................................................................................................22
Minnesota Dep't of Corr., *Residential Proximity & Sex Offense Recidivism in Minnesota* 2 (2007).................................................................................22
Minnesota Department of Corrections, *Sex Offender Recidivism in Minnesota* (2007)...........................................................................................................15
National Alliance to End Sexual Violence, *Community Management of Sex Offenders*.....................................................................................................11
Nobles et al, *Effectiveness of Residence Restrictions in Preventing Sex Offense Recidivism*, 58 Crime & Delinquency 612-642 (2012).......................................21
Ohio Department of Rehabilitation and Correction, Bureau of Planning and Evaluation, *Ten-Year Recidivism Follow-Up of 1989 Sex Offender Releases* (2001)...........................................................................................................15
Ruth E. Mann, Karl Hanson and David Thornton, *Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors,* Sexual Abuse: A Journal of Research and Treatment, XX(X) 1-27 ..........................................................................................................18
Sample and Bray, *Are Sex Offenders Dangerous?* 3 Criminology and Public Policy, No. 1, 59-82 (2003) ..........................................................................16

Sandler et al., *Does A Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law*, 14 Psychology, Public Pol. and Law 284–302 (2008) .....23
Sex Offender Management Board, *White Paper on Use of Residence Restrictions as a Sex Offender Management Strategy* (2009).....27
State of Connecticut, Office of Policy and Management, Criminal Justice Policy & Planning Division, *Recidivism among sex offenders in Connecticut* (Feb. 15, 2012).....15
State of New York, Department of Corrections and Community Supervision, *2010 Inmate Releases: Three Year Post Release Follow-up*.....15
Tabachnick & Klein, Association for Treatment of Sexual Abusers, *A Reasoned Approach: Reshaping SO Policy to Prevent Child Sexual Abuse* (2011).....10
Tewskbury, Richard, *Collateral Consequences of Sex Offender Registration,* 21J. Contemp. Crim. Just 67-81 (2005).....28
United States Government Accountability Office, *Report to the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, House of Representatives, Sex Offender Registration and Notification Act: Jurisdictions Face Challenges to Implementing the Act, and Stakeholders Report Positive and Negative Effects* 19 (2013).....35
Zandbergen et al, *Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Criminal Justice and Behavior 482-502 (2010).....22
Zevitz & Farkas, U.S. Department of Justice, Office of Justice Programs, *Sex offender community notification: Assessing the impact in Wisconsin* (2000).....27
Zgoba et al., *A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act*, (Research report submitted to the National Institute of Justice, 2012).....11

## STATEMENT OF IDENTITY & INTERESTS OF THE AMICI CURIAE[1]

The **Association for the Treatment of Sexual Abusers** (ATSA) is an international, interdisciplinary non-profit organization for the advancement of professional guidelines and practices in the field of sex offender treatment, research, management and policy. ATSA is dedicated to preventing sexual abuse through effective treatment and management of individuals who sexually abuse or are at risk to abuse. Through research, professional education, and shared learning, ATSA promotes evidence-based policies and practices that protect the public from sexual violence. ATSA's members include many of the world's foremost researchers in the study of sexual violence as well as professionals who conduct evaluations and provide treatment services to sexual abusers and survivors of sexual abuse. Given its unique scientific expertise and mission, ATSA has a significant interest in the proper resolution of this case, as well as an important perspective for the court's evaluation of public safety policies.

The **Citizens Alliance on Prisons and Public Spending** (CAPPS) is a nonprofit, nonpartisan policy and advocacy organization that works to reduce the social and economic cost of mass incarceration. Because policy choices, not crime

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief, nor did any party or party's counsel or any person other than amici contribute money for the preparation and submission of this brief. Pursuant to a discussion of the Court Rules with the Clerk's Office, the word count does not include the Statement of Identity and Interest.

rates, determine corrections spending, we seek to re-examine those policies and shift resources to services proven to prevent crime, better prepare people for success after release, support victims and improve the quality of life for all Michigan residents. CAPPS advocates multiple evidence-based strategies for reducing Michigan's prisoner population and for using resources at all levels of the criminal justice system cost-effectively.

The **Human Rights Defense Center** is a nonprofit corporation headquartered in Florida that advocates and works for the human rights of, and litigates for, people held in U.S. detention facilities. It also publishes the monthly journal Prison Legal News, which has reported extensively about sex offender issues. The Center believes using sex offender registries as a means to protect the public is fundamentally and unequivocally flawed and has consistently opposed their creation and use since 1990. See humanrightsdefensecenter.org.

The **Michigan Chapter of the National Association of Social Workers** (NASW-Michigan) supports, promotes and advocates for professional social work practice, practitioners, and the social work profession and works to improve the quality of life for the people of Michigan. NASW - Michigan has no parent corporation but is affiliated with the national office of the National Association of Social Workers. NASW - Michigan has over 6,000 members who live and work in the State of Michigan. The Chapter works with several allied organizations to

promote causes and services that improve society and helps shape legislation that affects the health, welfare, and education of all people. Our members serve as experts in many areas of social work interest, including areas that are impacted by the outcome of this case.

NASW - Michigan believes the safety of vulnerable people and survivors of sexual assault is paramount. The social work profession, and NASW, has a strong commitment to social justice. Vague and overly-complex residency requirements and exclusion zones are unjust and lack empirical support of their effectiveness in keeping people safe and reducing recidivism. NASW - Michigan supports evidence-based best practices and resource utilization that leads to the successful reentry of sex offenders and the safety of vulnerable people.

The **Michigan Council on Crime and Delinquency** (MCCD) is a non-profit organization whose mission is to improve the effectiveness of policies and systems aimed at the prevention and reduction of crime and delinquency. Since our establishment in 1956, we have been a trailblazer in addressing the underlying causes of crime and advocating for the use of evidence-informed approaches within Michigan's juvenile and criminal justice systems. Through efforts in data-driven research, community organizing, training, and technical assistance, MCCD strives to engage and prepare Michigan citizens and leaders to collaborate for safer, healthier communities. Additionally, we work to implement and evaluate model

programs and strategies that will protect the public. MCCD is committed to managing sex offenders in Michigan communities according to policies that reflect current, comprehensive research regarding effectiveness.

The **NorthWest Initiative** (NWI) is a non-profit organization working to strengthen and sustain healthy communities in select Lansing, Michigan neighborhoods. A.R.R.O. (Advocacy, Re-entry, Resources, Outreach) is a program of NWI that assists probationers, parolees and former offenders no longer under supervision.

A.R.R.O. provides a supportive atmosphere for ex-offenders, prisoners, their families, and local residents to come together and address issues of common concern. A.R.R.O. works to improve community safety through activities that encourage ex-offenders to participate in the community as full-fledged citizens providing for themselves and their families. A.R.R.O. places equal importance on the welfare of all individuals, including both ex-offenders and victims.

A.R.R.O provides direct assistance to people living in the mid-Michigan counties of Ingham, Eaton and Clinton, including efforts to find housing and employment for people convicted of sex offenses. In 2014, A.R.R.O served more than 600 clients, roughly 275 of whom were required to register as sex offenders.

The **Ohio Justice & Policy Center** is a non-profit law firm and advocacy office in Ohio. OJPC works to create fair, intelligent, redemptive criminal-justice

systems through client-centered advocacy, innovative policy reform, and cross-sector community education. Statewide and nationally, OJPC has worked extensively to advocate for sex-offender management policies - and general criminal reentry public policies - that create safe and just communities.  The firm also provides community education on issues of criminal justice through clinical legal education, community presentations, internships, and written legal and policy guides. OJPC is known within Ohio, and throughout the country, for its expertise in safe sex offender management strategies and related litigation.

The **Professional Advisory Board to the Coalition for a Useful Registry** (PAB) is an organization that promotes public safety and constructive changes to sex offender laws in Michigan that reduce the over-inclusion of juvenile and low-risk offenders. PAB strives to make the Michigan Sex Offender Registry more meaningful and useful to everyone, while promoting the ability of low-risk offenders to achieve their potential as constructive members of society. PAB is a multidisciplinary group of professionals that includes prosecutors, defense attorneys, judges, probation officers, and professionals involved in treatment of victims and offenders. *See* Professional Advisory Board list, attached. The Board also undertakes research and advocacy.

The **Sentencing Project** is a national non-profit organization engaged in research and advocacy for criminal justice reform. Research and publications of

The Sentencing Project have been widely cited by policymakers, practitioners and the academic community, and staff of the organization are frequently invited to testify before the U.S. Congress and state legislative bodies. The organization is committed to sentencing and corrections reform that promotes more effective and compassionate public safety outcomes, which include addressing collateral consequences of convictions and barriers to reentry that in many respects are counterproductive to individual and community needs.

## INTRODUCTION

Good public policy has three fundamental characteristics: it is rational, fair and cost-effective. Michigan's Sex Offender Registry Act (SORA) has none of these attributes. On the contrary, it is an extreme overreaction to a serious but very specific concern about child sexual predators that is based on myth and misconception.

Preventing sexual abuse is, without question, a compelling state interest for Michigan and is also a core interest of each amicus. However, SORA does little or nothing to protect the public in general or children in particular because the vast majority of the people required to register are not going to commit another sex offense against anyone. Multiple aspects of the registry, including the public's access to misleading information, the extensive state monitoring of daily life, and the prohibitions on living, working and "loitering" in vast areas of the community

have been uniformly shown by substantial research to be ineffective at best and often counterproductive.

The label “sex offender” is based solely on past conviction, without any assessment of current dangerousness. The physical exclusion of all people with sex offense convictions from many (or, in some urban areas, most) neighborhoods, the constant fear of incarceration for failing to meet vague and oppressive registration requirements and the indiscriminate public shaming of everyone placed on the public registry undermines the ability of former offenders – and their families – to lead normal, productive lives. The public nature of the registry also cultivates groundless fears that there are tens of thousands of dangerous predators living among us and creates a state-defined class of pariahs whose treatment can never be too harsh.

The operation of the registry also requires substantial public expense. Local law enforcement officials must collect and process information, monitor registrants and prosecute those who are not in compliance. Local courts must adjudicate the charges. Local jails and state prisons must house those who are incarcerated for registry violations. The Michigan State Police must dedicate staff solely to the maintenance of the public registry. There is literally no proof that this investment has done anything to increase public safety.

A non-public registry that allows law enforcement to track those few individuals who actually present an ongoing threat to public safety might have value for investigating and, possibly, preventing crime. Placement based on individualized risk assessments, including validated statistical tools and case-specific information, would be rational. Applying only those requirements and restrictions actually proven to decrease reoffending would also be rational. A process for seeking review and removal, as exists in some states, would be fair, as would eliminating requirements that are so vague as to be incapable of clarification by law enforcement or compliance by registrants. Such a registry would also be cost-effective, greatly reducing the expense of administration and enforcement without any concomitant decrease in public safety.

## ARGUMENT

### I. Michigan's sex offender registry is not rationally designed for its intended purpose because it rests on misconceptions about sexual offenses and offenders that have been soundly refuted by a large body of research.

Michigan's Sex Offender Registry Act (SORA) begins by declaring:

> …The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. M.C.L. 28.721a.

While the intent is clear, the legislature's determination of "facts" was actually a litany of conclusions supported only by beliefs, assumptions and political rhetoric. And the requirements imposed by the act, although undeniably "comprehensive," are neither appropriate nor effective.

When SORA was enacted in 1994, it was a private database for law enforcement use only that had no regular reporting requirements. This served the state's purposes adequately for more than a decade. The registry became public in 2004; geographic exclusion zones were added in 2006; sweeping additional restrictions, reporting requirements and tier classifications took effect in 2011.

### A. People convicted of sex offenses are a heterogeneous group that present widely different risks of re-offending and warrant individualized treatment that recognizes these differences.

SORA, like sex offender registries around the country, was a response to media reports about horrific but isolated instances of children being abducted and/or raped and murdered, beginning with Adam Walsh in 1981. The image underlying the registry is of the worst possible case – the pathological stranger who preys on children. This image is used to justify excluding everyone who has ever been convicted of a sex offense from areas where children congregate and monitoring their activities closely for as long as their entire lives.

However, current research indicates that individuals who offend sexually are a heterogeneous group who cross all socioeconomic, educational, gender, and

cultural lines. Hanson & Morton-Bourgon, *Predictors of Sexual Recidivism: An Updated Meta-Analysis* (2004). They engage in different behaviors with different victims for which they have different motivations, exhibit distinct criminogenic needs and demonstrate widely disparate levels of risk for reoffending. *Id.* Thirty to fifty percent of those who sexually abuse children are children or teenagers themselves. These offenders are highly susceptible to treatment and tend to stop their behavior as they mature. Tabachnick & Klein, Association for Treatment of Sexual Abusers, *A Reasoned Approach: Reshaping SO Policy to Prevent Child Sexual Abuse* (2011).

Moreover, the same statutory offense can present a broad array of factual circumstances, culpability and actual harm. Registry schemes that group people by offense to determine how frequently they must report and how long they must stay on the registry ignore these critical distinctions.

Criminal justice experts and victims agree that to best protect the community, the treatment and management of former sex offenders should apply individualized restrictions and provide more intensive services to those people at the highest risk of reoffending. J. Bonta & D.A. Andrews, Public Safety Canada, *Risk-Need-Responsivity model for offender assessment and rehabilitation* (2007); Hanson et al., *The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis,* 36 Criminal Justice and Behavior 865-891

(2009); National Alliance to End Sexual Violence, *Community Management of Sex Offenders, http://endsexualviolence.org/where-we-stand/community-management-of-sex-offenders.* The registrant's level of risk can be determined by an empirically validated risk assessment tool and an assessment of his or her individualized risk factors and community re-entry needs to ensure basic lifestyle stability. *Id.* Sex offenders are most accurately assessed by empirically-based tools, not by the legal definition or seriousness of their conviction. Zgoba et al., *A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act*, (Research report submitted to the National Institute of Justice, 2012). This avoids "overdosing" people with unneeded treatment and oversight which, research has found, can actually increase the risk of reoffending. Hanson et al, *supra*. Fifteen states, including such large jurisdictions as California, Texas and Georgia, have recognized the importance of individualized assessments by making their registries risk-based, rather than offense based. *Doe v. Sex Offender Registry Brd.*, 41 N.E.3d 1058, *8 n.20 (Mass. 2015).

The Michigan Department of Corrections (MDOC) has also recognized the importance of using evidenced-based practices in both treatment and community supervision. For many years, the MDOC placed prisoners in treatment programs based solely on their offense. Everyone convicted of a long list of assaultive offenses was required to complete the Assaultive Offender Program (AOP),

regardless of individual circumstances. Everyone convicted of a sexual offense was required to complete the Sex Offender Program (SOP). These across-the-board requirements led to long waiting lists. Many prisoners were denied parole at their first eligibility date solely because they had not been able to access the required program.

The MDOC has moved away from this offense-based process. It now employs risk assessment instruments and assigns people to evidence-based programs depending on the likelihood of re-offending. Those who score low on the risk for violence are not required to complete any program, unless referred by the parole board. Those who are at moderate or high risk of committing a new violent offense are placed in programs of appropriate intensity. Sex offenders are assessed using both specialized statistical tools and clinical evaluations. Those who are at low risk for committing a new sex offense are not required to complete treatment. Memorandum from MDOC Deputy Directors Thomas Finco, Charles Sinclair and Randall Treacher to Correctional Facilities Administration and Field Operations Staff, *RE: Risk Based Prisoner Program Referrals-UPDATED* (June 11, 2012) (copy attached). See also, Citizens Alliance on Prisons and Public Spending, *Programs for sex, assaultive offenders: an update,* Consensus (Fall, 2011), pgs 16-18. Waiting lists have declined substantially, parole delays are less

frequent and scarce treatment resources are targeted where they will do the most to enhance public safety.

The MDOC also uses risk assessment to individualize supervision requirements for probationers and parolees. The length of supervision periods, frequency and type of reporting and nature of conditions are now better tailored to the risks and needs of the offender and can be changed as appropriate over time. Here, too, scarce resources are targeted at those who present an actual high risk to the community. *Richard Stapleton Expert Report,* R. 91-4, Pg.ID#4775

However, for sex offenders, this strategy is undermined by the requirements of SORA. Everyone convicted of a sex offense who is on probation or parole must be held to the requirements of the SORA tier to which he or she is assigned, based solely on the offense. Thus they are subject to reporting requirements, residence and employment restrictions and supervision periods ranging from 15 years to life that would not otherwise have been imposed by the MDOC. Unlike probation and parole conditions, the SORA requirements do not decrease over time as the person successfully integrates into the community and the affected person cannot petition for change. As a result, low and moderate risk probationers and parolees are presented to the community as if they are "intolerably dangerous", low risk people are subjected to more oversight than is fair or effective, probation and parole agents have far more difficulty helping their clients find stable housing and

employment, and the goals of reunifying families and building prosocial community support networks are harder to achieve. *Id.*

The ironies are clear. The purpose of both treatment and community supervision by the MDOC is to prevent reoffending and promote public safety. Thus the goals of Corrections and SORA are the same. Yet the MDOC, with decades of experience and extensive research capacity, has determined that risk-based strategies are not only adequate to the task but are the most likely to be effective. SORA, on the other hand, with the harsh, ineffectual and undifferentiated requirements of the registry and exclusion zones, actually undercuts the MDOC's evidence-based efforts. By individualizing treatment, attempting to make supervision conditions realistic and rewarding success, the MDOC presents low-risk people convicted of sex offenses with the chance to redeem themselves and become productive members of the community. SORA then intervenes and takes all hope away. The State's own approaches to sex offenders are at war with each other.

**B. Re-offense rates for those convicted of sex offenses are actually very low.**

High recidivism rates for sexual offenders are often cited in support of stringent restrictions. The belief that sexual offending is compulsive and incurable is so strongly ingrained that research findings to the contrary are often rejected out

of hand. However, as Table 1 shows, the body of research demonstrating that sex offender recidivism rates are extremely low for new sex offenses in particular and for new offenses generally is remarkably consistent.[2] Most of these studies concentrate on the first three to five years after release from prison, when re-offense rates would be at their highest. Joint Statement of Facts, ¶¶ 341-48, R. 90, Pg. ID # 3799-3801 Several analyses have found that people convicted of sexual offenses against children have lower recidivism rates than those with adult

---

[2] The sources for the table, in the order in which the jurisdictions are listed, are: Langan et al, *Recidivism of Sex Offenders Released from Prison in 1994,* U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C., 2003); California Sex Offender Management Board, *Recidivism of Paroled Sex Offenders – A Ten(10)Year Study* (2008); California Sex Offender Management Board, *Recidivism of Paroled Sex Offenders – A Five (5) Year Study* (2008); State of Connecticut, Office of Policy and Management, Criminal Justice Policy & Planning Division, *Recidivism among sex offenders in Connecticut* (Feb. 15, 2012); Levenson and Shields, *Sex Offender Risk and Recidivism in Florida* (2012)*;* Indiana Department of Correction, *Recidivism Rates Compared: 2005-2007* (2009) plus data for 2005 releases provided by research analyst Aaron Garner; Maine Statistical Analysis Center, USM Muskie School of Public Service, *Sexual Assault Trends and Sex Offender Recidivism in Maine* (2010); Citizens Alliance on Prisons & Public Spending, *Denying parole at first eligibility: How much public safety does it actually buy? A study of prisoner release and recidivism in Michigan* (2009) [releases from 1986-1999]; Minnesota Department of Corrections, *Sex Offender Recidivism in Minnesota* (2007); State of New York, Department of Corrections and Community Supervision, *2010 Inmate Releases: Three Year Post Release Follow-up* [releases from 1985-2010]*;* Ohio Department of Rehabilitation and Correction, Bureau of Planning and Evaluation, *Ten-Year Recidivism Follow-Up of 1989 Sex Offender Releases* (2001); Barnoski, *Sex Offender Sentencing in Washington State: Recidivism Rates* (Washington State Institute for Public Policy (2005).

victims.[3] Many studies have also noted that re-offense rates for sex offenders are the lowest of any offense group except homicide.[4]

---

[3] Langan et al; Ohio Department of Rehabilitation; Barnoski, all at note 3, supra.

[4] Langan et al; Maine Statistical Analysis Center; Citizens Alliance on Prisons & Public Spending; State of New York; Barnoski, all at note 3, supra; Iowa Department of Corrections, Iowa Recidivism Report: *Prison Return Rates FY 2013* (March 2014); Kohl et al, *Massachusetts Recidivism Study:A Closer Look at Releases and Returns to Prison,* Urban Institute, Justice Policy Center (Washington, D.C., 2008); Sample and Bray, *Are Sex Offenders Dangerous?* 3 Criminology and Public Policy, No. 1, 59-82 (2003); Flaherty, *Recidivism in Pennsylvania State Correctional Institutions, 1997-2003*, Pennsylvania Department of Corrections (2005); Holley and Ensley, *Recidivism Report: Inmates Released from Florida Prisons, July 1995 to June 2001,* Florida Department of Corrections (2003).

Table 1: Sex Offender Recidivism Rates

| Study | Total Cases | New Sex Crime | Any New Offense | Years in Follow-up Period | Recidivism Measure |
|---|---|---|---|---|---|
| Bureau of Justice Statistics | 9,691 | 3.5% | 24.0% | 3 | Reconviction* |
| California | 3,577 | 3.4% | 7.2% | 10 | Return to prison |
| California | 4,204 | 3.2% | 7.9% | 5 | Return to prison |
| Connecticut | 746 | 2.7%<br>1.7% | ------ | 5 | Reconviction<br>Return to prison |
| Florida | 250<br>250 | 13.7%<br>5.2% | ------<br>------ | 10<br>5 | Re-arrest<br>Re-arrest |
| Indiana | 3,615 | 1.9% | 11.2% | 3 | Return to prison |
| Maine | 341 | 3.8% | 7.0% | 3 | Return to prison |
| Michigan | 6,673 | 3.1% | 7.5% | 4 | Return to prison |
| Minnesota | 3,166 | 5.7%<br>3.2% | 25.4%<br>8.6% | 3<br>3 | Reconviction*<br>Return to prison |
| New York | 21,946 | 1.7% | 7.5% | 3 | Return to prison |
| Ohio | 879 | 8.0%** | 14.3% | 10 | Return to prison |
| Washington | 4,091 | 2.7% | 13.0% | 5 | Reconviction |

*includes misdemeanors; **also found that 1.4% had parole violations for behavior constituting a sex offense.

Thus the critical assumption used to justify singling out former sex offenders for extraordinarily burdensome requirements and prohibitions – that they will inevitably commit new sexual offenses – is fundamentally flawed. Not only do

decades of data from multiple jurisdictions fail to support this belief, they emphatically disprove it.

The reasons why former sex offenders are so unlikely to reoffend are not altogether clear. It may well be a combination of non-recurring circumstances, guilt, shame, treatment success and the deterrent effect of punishment. As one research team noted:

> Although the cognitive-behavioral worldview implies that all behavior follows from cognitions, a single act of sexual offending does not entail the existence of offense-supportive attitudes. Like the rest of us, sexual offenders are able to do things that are contrary to their values and moral beliefs, acts for which they feel ashamed and deeply regret. Ruth E. Mann, Karl Hanson and David Thornton, *Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors,* Sexual Abuse: A Journal of Research and Treatment, XX(X) 1-27 at 10.

Notably, much of the research covers people who were released before registries were introduced and well before they became so onerous. In addition, once people have been convicted of a sex offense, that fact is likely to be well known to their families and communities. Since most offenders against children were familiar to their victims, the people responsible for protecting them would be attentive to any potential risk without any need for notification.

### C. Recidivism risk decreases over time, making decades-long registration requirements and geographic exclusions pointless.

It is also counter-factual to require registration and enforce prohibitions for 15 or 25 years or life. While low-risk offenders are consistently low-risk from the start, the likelihood that a high-risk offender will commit a new sex crime declines considerably over time. Hanson et al., *High Risk Sex Offenders May Not Be High Risk Forever,* 29 J. of Interpersonal Violence, no. 15 (Oct. 2014); Howard, *Hazards of different types of reoffending*, UK Ministry of Justice Research Series (2011); Harris & Hanson, *Sex offender recidivism: A simple question*, Report, Public Safety Canada (2003).[5]

The longer a sex offender remains offense-free in the community, the more the risk for re-offense decreases. *Id.* After enough years offense free in the community, the likelihood that a registrant will commit a new sex offense is the same as the likelihood that an "out of the blue" sexual offense will be committed by a person with no history of a sexual crime. *Id.* at 9-11; Hanson Decl. R 93, Pg.ID#5208); Levenson Dep. R 90-10, Pg.ID#4219. Thus, SORA's lengthy and

[5] This decrease in risk is true for all offenders, not just sex offenders: the longer any offenders remain offense-free in the community, the lower their chance of coming into contact with the justice system again. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?,* 5 Criminology & Pub. Pol. 483 (2006) (finding that after 6 or 7 crime-free years, the risk of committing a new offense begins to approximate the risk of new offenses among persons with no criminal record).

lifetime requirements and restrictions, applied across the board, do not enhance and are not even rationally connected to the state's public safety goals.

### D. Geographic restrictions do not reduce offenses against children because most such offenses are committed within the child's residence.

Prohibiting people convicted of sexual offenses from residing, working or "loitering" within specified distances of schools, parks or other areas where children congregate does nothing to serve the state's goal of protecting children because these are not the locations where children are victimized. On the contrary, the overwhelming majority of offenses occur in a residence, typically the child's own home.

Michigan State Police statistics show 4,401 instances of first-degree criminal sexual conduct were reported in 2014. Michigan Incident Crime Reporting (MICR), 2014 CSC – First Degree, http://www.michigan.gov/documents/msp/Annual_Rape_493235_7.pdf. One of the key characteristics that can elevate an offense involving sexual penetration to first-degree is the age of the victim, so it is not surprising that 45.2 percent of the total involved victims younger than 15. Nearly 80 percent of the total occurred in a "residence/home." Only 1.7 percent occurred at an elementary or secondary school; only 0.6 percent occurred at a park or playground. Thus controlling former offenders' proximity to these locations cannot be expected to impact re-offending. Moreover, research has consistently

indicated that reoffending is not related to the proximity of an offender's residence to schools, daycares, or other youth centers. As will be seen below, offense location is connected to the relationship between offenders and victims, not to places where children publicly congregate.

One study that focused specifically on Michigan and Missouri was unable to examine the relationship between residency restrictions and sexual re-offending specifically because the reoccurrence rate was so low (less than 3 percent of the sample). However it found that any relationship between residency restrictions and overall reoffending by sex offenders is small. The effect of restrictions in Michigan was actually a slight increase in recidivism while in Missouri it was a slight decrease. Huebner et al, *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri* (2013) at 9-10 (orig. emph).

Numerous other studies corroborate that the location of a sex offender's residence does not influence where a crime may occur and that residency restrictions do not reduce recidivism. Agan, *Sex Offender Registries: Fear without Function?*, 54 J.L. & Econ 207-239 (2011). *See also*, Nobles et al, *Effectiveness of Residence Restrictions in Preventing Sex Offense Recidivism*, 58 Crime & Delinquency 612-642 (2012) (finding that implementing residence restrictions did not decrease sex crime arrests or recidivism, "suggesting that the residence restriction did not achieve its intended goal of reducing recidivism"); Zandbergen

et al, *Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Criminal Justice and Behavior 482-502 (2010) (finding no significant relationship between reoffending and proximity to schools or daycares); Minnesota Dep't of Corr., *Residential Proximity & Sex Offense Recidivism in Minnesota* 2 (2007) ("Not one of the 224 [recidivist] sex offenses [studied] would likely have been deterred by residency restrictions"); Colorado Dep't of Public Safety, Division of Criminal Justice, *Report on safety issues raised by living arrangements for and location of sex offenders in the community* (2004) (finding no evidence that residence restrictions prevent repeat sex crimes and that residency was not linked to crime-location). Even for sex offenders identified by risk assessment as high risk, there is no evidence that residential proximity to parks or schools played a role in re-offense. Minnesota Dep. of Corr., *Level three sex offenders residential placement issues* (2003).

**E. SORA registration and notification requirements do not reduce the number of sexual offenses because the majority are committed by first offenders known to the victims.**

The fear that drives public notification and stringent registration requirements is "stranger danger" – the image of children being abducted by unknown predators. Horrifying as such crimes are, they are also incredibly rare. Finkelhor et al., National Center for Missing and Exploited Children, *Nonfamily Abducted Children: National Estimates and Characteristics* (2002). See also,

Zevitz, *Sex offender community notification: Its role in recidivism and offender reintegration*, 19 Criminal Justice Studies193–208 (2006), supra (finding that none of the recidivistic offenses in their study sample were for predatory sex crimes involving strangers). Yet tragic sexually-motivated crimes broadcast in the media provoke public alarm and emotional responses, driving legislation that may have little meaningful impact. Levenson et al., *Public perceptions about sex offenders and community notification policies*, 7 Analyses of Social Issues and Public Policy1–25 (2007).

The Department of Justice found that 93 percent of child sexual abuse victims were abused by a family member or well-known acquaintance. Bureau of Justice Statistics, *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics*, 10 (2000). Moreover, the overwhelming majority of sex offenses are committed by first-time sex offenders: 95.8% of all sexual offense arrests involved first-time sex offenders, "casting doubt on the ability of laws that target repeat offenders to meaningfully reduce sexual offending." Sandler et al., *Does A Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law*, 14 Psychology, Public Pol. and Law 284–302 (2008) (also finding that 96% of rapes and 94% of child molestations are committed by first time sex offenders).

Michigan State Police data on first-degree criminal sexual conduct reported in 2014 show that one-third of the offenders were family members. Many others were acquaintances, neighbors, boyfriends. Only eight percent were strangers. Michigan Incident Crime Reporting, supra. Although the data is not broken down by age of the victim, it is apparent that a small minority of children are assaulted by strangers. On the other hand, more than 31 percent of the offenders were themselves younger than 18. *Id.*

The State Police data for third-degree criminal sexual conduct, also a Tier III offense involving penetration, show that fully two-thirds of the victims were 15 or older. Where the relationship to the victim was known, only nine percent were strangers. Thus the majority of Michigan sexual assault victims were not young children and were not victimized by strangers.

Multiple studies have found that broad public registration and notification requirements create no statistically significant reduction in recidivism – indicating these requirements neither enhance nor are rationally related to the government's intended goal of preventing sexual abuse. While public registries were created to assist law enforcement and inform the community, research shows that state efforts to make offenders more visible do not necessarily promote public safety.[6] Zevitz,

---

[6] There is evidence that registration requirements without any public notification can reduce sex crimes and, therefore, limited registries may be beneficial to local authorities for monitoring and apprehension purposes. J.J. Prescott & Rockoff, *Do*

*Sex offender community notification,* supra (registries were made public to help people protect themselves against future victimization); Association for the Treatment of Sexual Abusers, "Sex Offender Registration & Notification", http://www.atsa.com/sites/ default/files/ppSORegNotification.pdf (registries were initially for law enforcement use only, to assist law enforcement with tracking/monitoring sex offenders and apprehending potential sex crime suspects). In Iowa, for example, the recidivism rate of people subject to the registry (3 percent) was not statistically significantly different from the rate of sex offenders who were not required to register. Adkins et al., Iowa Dep't of Human Rights, *The Iowa sex offender registry and recidivism* (2000). A Washington State study found no statistically significant difference in recidivism rates between offenders who were subjected to community notification and those who were not. Matson &. Lieb, Washington State Institute for Public Policy, *Community notification in Washington State: A 1996 survey of law enforcement* (1996). Likewise, research on New York State's sex offender registration and notification laws revealed no evidence that those laws reduced sexual offending by rapists, child molesters, sexual recidivists, or first-time sex offenders. Sandler et al., *Does A Watched Pot Boil?* supra. Researchers also found that increasing public notification did not

---

*Sex Offender Registration and Notification Laws Affect Criminal Behavior?* 54 J.L. & Econ 161-206 (2011). While some first-time offenders are deterred by public notification sanctions, the imposition of community notification on convicted offenders *ex post* may make them more likely to recidivate. *Id.* at 192.

decrease rearrest and reincarceration, undermining the alleged utility of these practices. Zevitz, *Sex offender community notification*, supra.

By focusing on “stranger danger”, SORA steers the community’s focus away from more likely perpetrators. SORA actually undermines the safety of children by encouraging parents to overprotect their children from strangers instead of protecting them from known and trusted individuals who are much more likely to actually cause them harm.

## II. SORA’s vague and broad-based restrictions and requirements have unfairly damaging collateral consequences for former offenders, their families and the community.

Stability is critical to preventing crime by anyone, whether first-offenders or those previously convicted. Residential and employment security and consistent social support reduce the likelihood that anyone will offend. For SORA registrants, re-offending may include a new sex offense, a new non-sexual offense (such as drugs or theft), a failure to register or to comply with SORA requirements or, if they are still under criminal justice supervision, a technical violation of probation or parole.

Sex offenders who received positive support through stable housing, family relationships, positive friendships, access to treatment and employment have significantly fewer probation violations and re-offenses than those with no support or negative support. *See, e.g.*, Colorado Dep’t of Public Safety, *Report on Safety*,

supra; Zevitz & Farkas, U.S. Department of Justice, Office of Justice Programs, *Sex offender community notification: Assessing the impact in Wisconsin* (2000). Public policies that impede these sources of stability and support can actually have the unintended consequence of undermining public safety.[7] *Id.*

Research suggests that risk factors such as unemployment, isolation, depression, and housing instability may correlate with increased recidivism for sex offenders. Sex Offender Management Board, *White Paper on Use of Residence Restrictions as a Sex Offender Management Strategy* (2009); Levenson & Cotter, *The Impact of Sex Offender Residency Restrictions: 1000 Feet from Danger or One Step from the Absurd?* 49 Int'l J. of Offender Therapy and Comp Criminology168 (2005); Colorado Dep't of Public Safety, *Report on Safety*, supra; Hanson & Morton-Bourgon, *Predictors of Sexual Recidivism,* supra; Kruttschnitt et al., *Predictions of Desistance Among Sex Offenders: The Interactions of Formal and Informal Social Controls,* 17 Just. Quarter., No. 1, 67-87 (2000).

Publication of a sex offender's identity, home address, place of work, and other identifying information can affect the offender's ability to remain offense free in the community due to stressors (shame, isolation, anxiety, and depression) that can trigger recidivism. Levenson & Cotter, *The Effects of Megan's Law on Sex*

---

[7] Among these are restrictions on Internet access. The Internet is a critical– and sometimes exclusive – means for finding employment and housing, fulfilling job duties and maintaining prosocial connections with family, friends, and the community.

*Offender Reintegration*, 21J. Contemp. Crim. Just., 298-300 (2005); Tewskbury, *Collateral Consequences of Sex Offender Registration,* 21J. Contemp. Crim. Just 67-81 (2005); Human Rights Watch, *No Easy Answers, Sex Offender Laws in the U.S.*, vol. 19, no. 4(G), 62 (September 2007).

SORA's vague and extraordinarily broad restrictions undermine all these sources of stability. This destabilization does overwhelming damage to former offenders and their families, complicates the work of corrections and law enforcement, and harms the community at large without any proof of compensating benefits. See generally, Levenson & Tewksbury, *Collateral Damage: Family Members of Registered Sex Offenders*, 34 American Journal of Criminal Justice 54-68, 65-66 (2009); Horowitz, *Protecting Our Kids? How Sex Offender Laws are Failing Us* (2015). The public is encouraged to fear and ostracize people who are harmless instead of being helped to focus on the small proportion of people who may actually be dangerous.

**Housing.** The ability of offenders to find stable housing is enormously reduced by geographic exclusion zones that make large areas of most communities off-limits to registrants. These prohibitions are further complicated by the vagueness of the laws that impose them, leaving registrants unsure where the boundaries of school property are and how to measure the required distance from them. Add to this the impact of public notification that reduces the availability of

potential housing even outside the exclusion zones because landlords are reluctant to rent to registrants or neighbors have made known their displeasure at having a former sex offender in their midst.

As the record shows, Plaintiff Doe #1 could not live with his own wife and children and Plaintiff Doe #4 could not live with other relatives because the homes were in prohibited areas. Registrants have even been denied access to homeless shelters. *See Poe v. Granholm*, 1:10-cv-318 (W.D. Mich. 2010). The difficulty of finding suitable housing, the need to move repeatedly and the fear of discovery by landlords and neighbors does not only affect registrants themselves. It creates instability, stress and isolation for family members and other supporters.

Residency restrictions and the vagueness with which they are defined also cause problems for corrections and law enforcement. Those charged with enforcing the registry cannot explain how to determine the boundaries of exclusion zones. The discretion to interpret SORA's meaning is ultimately left to local prosecutors. Joint Statement of Fact, ¶¶ 403-408, 413-424, 440-443, R. 90, Pg.ID#3824-29, 3833. Probation and parole officers cannot be sure which housing violates supervision conditions. Richard Stapleton Expert Report R 91-4, Pg.ID#4775.

The American Correctional Association, the world's largest professional organization of corrections practitioners, has concluded that residence restrictions

are "contrary to good public policy" because they "create disincentives for predatory sex offenders to cooperate with responsible community corrections agencies" and create "unintended consequences" that undermine public safety. Am. Corr. Ass'n, *Resolution on Neighborhood Exclusion of Predatory Sex Offenders* (Jan. 24, 2007).

**Employment.** The SORA requirements that prohibit working, as well as living, in exclusion zones and the public notification provisions have a similar effect on the ability of registrants to find and keep employment. No matter how well qualified, hard-working and unlikely they are to reoffend, registrants are excluded from jobs because of the business location or the attitudes of employers. Even willing employers are understandably reluctant to have their business address posted on the sex offender registry. Stunted employment opportunities mean that registrants' ability to support themselves and their families is reduced. Employers lose good employees. The community as a whole sees the wage-earning and tax-paying capacity of 40,000 plus members reduced.

**Social support.** The public nature of the registry makes it difficult for registrants to develop and maintain personal relationships. The families of registrants must share the residential instability, financial impact, public hostility and shame. Children are particularly vulnerable to these consequences. They may be forced to change schools often or live in undesirable locations. Dad may be

prohibited from attending school and sporting events; classmates may bully them and friends may not be allowed to visit them in their homes; vacations are curtailed by SORA travel restrictions.  Regardless of the nature or circumstances of the original offense, how long ago it occurred or the low likelihood a registrant will re-offend, registrants' families live in a state of anxiety and hopelessness for decades or lifetimes.

If in fact the damaging consequences of SORA were an unavoidable by-product of protecting children from sexual assault, they would at least arguably be justified.  But since SORA's complex web of requirements and prohibitions has been shown to be ineffectual and is indiscriminately applied without regard to the actual dangerousness of registrants, that justification is lacking.  The imposition of significant harm by government on one class of citizens without any proven countervailing benefit to the community as whole is public policy at its worst.

## III. Michigan's sex offender laws expend considerable taxpayer dollars and law enforcement resources in an inefficient and counterproductive manner.

SORA does not only fail the human cost/benefit analysis, it fails the fiscal one as well.  Michigan expends significant resources to enforce its vague and overly broad terms even though most registrants are at low risk for reoffending from the start and nearly all become very low risk with the passage of time.  As prominent researchers have noted:

> "Rather than considering all sexual offenders as continuous, lifelong threats, society will be better served when legislation and policies consider the cost/benefit break point after which resources spent tracking and supervising low-risk sexual offenders are better re-directed toward the management of high-risk sexual offenders, crime prevention, and victim services." Harris & Hanson, *Sex offender recidivism*, supra at 12.

Thus SORA fails the third key measure of good public policy: it is not cost-effective.

The exact cost of operating Michigan's SORNA-compliant sex offender registry is unknown. Neither the legislature nor the State Police have studied the cost of setting up and operating the registry. Hawkins Dep. R. 90-20, Pg.ID# 4551. The Michigan Sex Offender Registration (SOR) unit's annual budget is about $1.2 million, of which $600,000 is for database support and $600,000 is for staff, supplies, and training. Johnson Dep. R. 90-16, Pg.ID# 4389.

These figures do not include any of the costs imposed on local law enforcement, the court system, county jails or the Michigan Department of Corrections. In the eight-year period from 2006-2013, 12,460 registrants were convicted of SORA violations. Of these, 4,832 were convicted of felonies and 7,628 were convicted of misdemeanors. Michigan State Police SORA Conviction Data, R. 91-22, Pg.ID#4906-08. Each conviction required law enforcement resources to investigate, arrest and prosecute. Each required judicial resources to adjudicate. Each involved punishment that used the resources of county probation offices and/or county jails and/or the Michigan Department of Corrections. While

the number of jail beds used is unknown, in 2013 there were 257 people in prison for SORA violations. Michigan Department of Corrections, *2013 Statistical Report, https://www.michigan.gov/documents/corrections/2014-04-04_-_MDOC_2013_Statistical_Report_-_Vers_1_0_452815_7.pdf,* The MDOC estimates that every 160 prison beds equates to a housing unit costing over $2.6 million annually. Citizens Alliance on Prisons and Public Spending*, 10,000 fewer Michigan prisoners: Strategies to reach the goal* (2015), note 8. SORA also contributes to the difficulty and expense of providing housing stability to sex offenders reentering the community. Thus, while the cost of SORA enforcement to cities and counties is unknown, it is apparent that the total cost to Michigan citizens runs well into the millions.

The cost of maintaining Michigan's sex offender registry will only increase over time, with about 2,000 new registrants added annually. Legislative Services Bureau Report on SORA 2013, R. 92, Pg.ID#5326-5337; Total Number On SOR By Year, R. 53, Pg.ID#4959-60. Almost three-quarters of all registrants are required to register for life. Total Number of Offenders By Tier, R. 92-4, Pg.ID#4961-62. As the registered population ages, more and more law enforcement resources will be spent monitoring people who are further and further away from their criminal past.

If Michigan had elected not to become SORNA-compliant, it would have lost 10 percent of its Byrne Judicial Access Grant – federal money that comes to states for use by prosecutors and local law enforcement. The Grant reduction would have been roughly $1 million (based on 2011 estimates). Hawkins Dep R. 90-20, Pg.ID# 4551.

Other state legislatures studied the projected cost of SORNA compliance – including the cost to local law enforcement – and determined that the loss of 10 percent of Byrne funds would be far less than the cost of complying with the Adam Walsh Act. The State of California Sex Offender Management Board determined that the cost of compliance would exceed $32 million. It issued a strong statement that "California State Legislature, Governor and citizens should elect not to come into compliance with the Adam Walsh Act." California AWA Position Statement, R. 92-23, Pg.ID#5131-35. California still uses an individual risk assessment tool for all offenders to determine where they should appear on the registry. Similarly, Texas determined that the real costs of implementing SORNA would range from $14 million to $25.9 million a year, which was far more than potentially lost Byrne funds. Texas Study, R. 92-25, Pg.ID#5159-69. According to an analysis by the Justice Policy Institute, in all 50 states, costs for implementing SORNA exceeded the potential loss of 10 percent of the Byrne Grant funding. Michigan, specifically, would spend over $16 million on SORNA compliance in its first year. Justice

Policy Institute. *What Will It Cost States to Comply with the Sex Offender Registration and Notification Act?* http://www.justicepolicy.org/images/upload/08-08_FAC_SORNACosts_JJ.pdf.

Currently, only 17 states are listed as having substantially implemented SORNA at the website of the Department of Justice's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking (SMART). http://www.smart.gov/sorna.htm#SMARToffice. In a survey of 27 non-implementing jurisdictions, 23 reported costs as an obstacle. United States Government Accountability Office, *Report to the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, House of Representatives, Sex Offender Registration and Notification Act: Jurisdictions Face Challenges to Implementing the Act, and Stakeholders Report Positive and Negative Effects* 19 (2013). Additional concerns expressed were that SORNA creates additional workload, conviction-based tiering is not a good indicator of risk and SORNA causes "difficulties in sex offenders' ability to reintegrate into the community." *Id.* at 26.

Even prosecutors agree. In a strong statement, the Iowa County Attorneys Association announced that "there is no demonstrated protective effect of the residency requirement that justifies the huge draining of scarce law enforcement

resources in the effort to enforce the[m]." Iowa County Attorneys Association, *Statement On Sex Offender Residency Restrictions In Iowa*, December 11, 2006.

## CONCLUSION

Amici share the goal of policymakers to protect Michigan's citizens, particularly the youngest and most vulnerable, from sexual abuse. However, "doing everything we can think of to control former sex offenders" is not a policy, it is a gut reaction justified only by unwarranted fears and misconceptions.
It is not only pointless but counterproductive to pile on reporting requirements, public notifications and geographic exclusions regardless of the effectiveness of these measures, the actual re-offense risk of the people to whom they are applied or the collateral damage they cause.

Our common goal is best achieved by employing clear, narrowly tailored requirements that are rationally related to their purpose, guided by research and applied in an individualized manner through the use of empirically derived risk assessment. If we truly care about preventing sexual offenses and healing those already victimized, we must invest resources in public education, victim services and offender treatment, not throw them away on strategies that create only an illusion of safety.

Respectfully submitted,

/s/ Douglas Mullkoff (P33252)
Kessler, Mullkoff & Hooberman LLP
402 West Liberty
Ann Arbor, MI 48103
(734) 761-8585
doug@kmhlaw.com

/s/ Barbara R. Levine (P24207)
Citizens Alliance on Prisons
and Public Spending
824 N. Capitol Ave.,
Lansing, MI 48906
(517) 482-7743
blevine@capps-mi.org

s/ Alexandra S. Appatova
Ohio Justice and Policy Center
215 E. 9th Street, Suite 601
Cincinnati, OH 45202
(513) 421-1108 x20
sappatova@ohiojpc.org

Counsel for *Amici Curiae*

# Attachment A

## Professional Advisory Board to the Coalition for a Useful Registry

**Chair: Honorable William Buhl, J.D.,** 36th Judicial Circuit Court Judge, Van Buren County; Retired (For more information email mecklenberg@msn.com or call 269-716-0318)

**Todd Bechler, B.S**. Criminal Justice, Adult Probation Officer and Parole Agent, 20th Circuit Court, Ottawa County

**Beth Berman, Psy.D.**, Licensed Psychologist; Child, Adolescent, Adult Psychotherapy; Relationship Therapy; Oakland County

**Nic Bottomley, LMSW,** 17th Circuit Court Adolescent Sexual Offender Treatment Program, Assessment and Treatment Provider; Adult Assessment and Treatment Provider, Catholic Charities; Kent County

***David Burnett**, **M.Div.**, Retired, Director of Chaplains, Michigan Department of Corrections; Eaton and Ingham County

**Cheryl Carpenter, J.D.**, Juvenile and Adult Defense Attorney; Wayne, Oakland, and Macomb Counties

**Charles Clapp, J.D.**, Juvenile Defense Attorney; Kent and Ottawa Counties

**Kathleen Cojanu**, B.A. Psychology, Juvenile Probation Officer; Oakland County; Retired

***Erin Comartin, MSW**, Former Manager of Research Support, Wayne State University; Assistant Professor at Oakland University

***Lynn D'Orio, J.D., LPC**, Juvenile and Adult Defense Attorney, Board Member of the Criminal Defense Attorney's Association of Michigan; Washtenaw County

**Anthony Flores J.D.,** Associate Professor, Cooley Law School; Former Criminal Sexual Conduct Unit Chief, Ingham County Prosecuting Attorney's Office; Ingham County

**Stuart Friedman, J.D.,** Criminal Appellate Attorney; Past Chair Prison & Corrections Section of the State Bar; Board Member Criminal Defense Attorneys of Michigan and State Bar Appellate Practice Section; Metro Detroit

**Honorable Patricia Gardner, J.D.**, Juvenile and Family Court Judge, 17th Circuit Court, Kent County

**David Griep, M.A**. Counseling and Guidance, Workforce Development Program Manager, Kandu Inc. (Prisoner Re-entry Agency and Michigan Works! Service Provider); Ottawa County; Retired

**Ronald Grooters, LMSW, ACSW**, Senior Clinician and Team Leader, Wedgewood Christian Services; Juvenile and Adult Assessment and Treatment Provider; 2009 – Present, President of Michigan Chapter of the Association for the Treatment of Sexual Abusers (MI-ATSA); Kent County

***Dr. James Henry, MSW, Ph.D.**, Victim Advocacy; Director of the Southwestern Michigan Children's Trauma and Assessment Clinic; Professor of Social Work, Western Michigan University, teaching courses in child sexual abuse; Co-Chair of Kalamazoo Community Mental Health Board; formerly with Child Protective Services for many years; Kalamazoo County

***John Jarema, J.D.**, Defense Attorney, Former Chief Prosecutor, 33rd Circuit Court, Charlevoix County

**Blair Johnson, J.D.**, Defense Attorney, Berrien County

**Dr. Poco Kernsmith, MSW, Ph.D.**, Researcher and Assistant Professor of Family and Sexual Violence, Wayne State University School of Social Work; Wayne County

***Dr. Roger Kernsmith Ph.D**., Researcher and Professor of Criminology, Eastern Michigan University; Wayne and Washtenaw County

**Doug Lewis, B.A.,** Family Studies, Youth in Transition Coordinator, State of Michigan, Department of Human Services, Bay and Arenac County

**Jennifer Lynn, J.D.,** Defense Attorney, Ottawa County

**Laura Marsh, LMSW**, Supervisor, Adolescent Sexual Offender Treatment Program (ATSOP) and Crisis Intervention Program (CIP), 17th Circuit Court, Kent County

***Dr. Barry Mintzes, Ph.D.**, Psychologist; Adolescent and Adult Assessment and Treatment Provider; former Warden of Jackson and Kinross Prisons; former Chief of Psychiatric Clinic at Jackson Prison; Ingham County

**Judi New, J.D.**, Family Law Attorney, Guardian Ad Litem for Foster Children in Wayne and Washtenaw Counties; President of Learning Disabilities Association (LDA) of Washtenaw County

**Jill Norbury, MA, LLP,** 4th Year Doctoral Student in Clinical Psychology; Assessment and Treatment Provider, Wayne and Oakland County

**Brian Prain, PLLC,** Defense Attorney, Wayne County

***Dr. Gary Rasmussen, Ph.D.**, Clinical and Forensic Psychology; Juvenile and Adult Assessment and Treatment Provider; Founder and Past President of Macomb County Care House; Oakland and Macomb County

**Susan Rogers, LMSW**, School Social Worker, Birmingham Public Schools; Developed and Implemented Health and Sexual Education Curriculum for Students with Special Needs; Director, Parare Consulting, PLC; Oakland County

**Matthew Rosenberg, MSW, CSW** treatment specialist, researcher, writer, and consultant in the areas of sexual crimes/deviancy and abuse

**Glenn Rutgers, M.A.** Executive Development, Michigan Works! (Work Force Development Agency); Ottawa County; Retired

**John Shafer, Ph.D. Behavioral Psychology, D.D.,** Retired Federal Law Enforcement Officer; Assessment/Treatment Juvenile and Adult Sex Offenders; Outpatient/ Inpatient Treatment (Dickerson Jail, Ryan Prison)

**Shannon Smith, J.D.,** Juvenile and Adult Defense Attorney, Wayne, Macomb, and Oakland County

***Ronald VanderBeck, Ph.D.** Forensic Psychologist, Human Resource Associates; Assessment and Treatment Provider; Kent County

**Steven Vitale, J.D.,** Criminal Defense Attorney, Former Oakland County High Crimes Prosecutor, Oakland County

**Karen Wickline, Ed.D., LLP,** Clinical Supervisor at Oakland County Children’s Village; runs the juvenile SO treatment program; Adjunct Professor of Psychology at Macomb Community College.

**Jennifer Zoltowski,** MS, LLP, Director Center for Assessment; former Clinician, Oakland County Children's Village; Oakland County

## ATTACHMENT B

# MICHIGAN DEPARTMENT OF CORRECTIONS

***"Expecting Excellence Every Day"***

## MEMORANDUM

DATE: June 11, 2012

TO: CFA and FOA Staff

FROM: Thomas Finco, Deputy Director, Correctional Facilities Administration
Charles Sinclair, Deputy Director, Field Operations Administration
Randall Treacher, Deputy Director, Operations Support Administration

SUBJECT: Risk Based Prisoner Program Referrals-UPDATED

Recently the Michigan Department of Corrections (MDOC) made the decision to transition from the Assaultive Offender Program (AOP) to the Violence Prevention Program (VPP), which is delivered by CFA staff. The first phase of VPP has begun, and prisoners will no longer be placed into AOP, with the exception of WHV, the youth population, and the Residential Treatment Program (RTP). Due to the recent changes related to the discontinuation of AOP, this memo has been updated.

This memorandum outlines the interim process for creating and maintaining risk-based program referrals until Violence Prevention Programming is fully implemented statewide and the Sex Offender Programming (SOP) Redesign has been completed.

As of the effective date of this memorandum, prisoners shall be provided programming based on the results of a validated risk assessment (COMPAS, VASOR, Static-99R) and additional referral criteria. Prisoners included in this process must be past or within 12 months of their Earliest Release Date (ERD). This process does not apply to prisoners with a positive parole action or those already enrolled in programming.

Eligible prisoners must be either: currently on (or are eligible for placement on) the list for VPP or currently on (or eligible for placement on) the list for SOP. This process applies only to the male prisoners within the MDOC.

For purposes of addressing this limited population of VPP/SOP wait list prisoners, Correctional Facilities Administration (CFA) Operations and Operations Support Administration (OSA) staff will refer appropriate prisoners for placement in programming in accordance with the criteria outlined in this memo.

The Residential Sex Offender Program (RSOP) is currently available only as a community-based program and will be arranged by Field Operations Administration (FOA) pursuant to the appropriate special condition of parole as ordered by the Parole Board.

**Violent Offender Programming**

Eligibility for VPP is based on the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) Violence Risk score and Adult Convictions of General Violence. The existing AOP waitlist will be screened and triaged by CFA-Office of Offender Reentry (CFA/OOR) using the VPP referral criteria. Prisoners who meet criteria for VPP Moderate, all security levels, and are past or within one year of ERD will be referred to Thinking for Change (T4C) delivered by certified CFA staff. Prisoners that meet criteria for VPP Moderate, all security levels, and have an ERD greater than one year will be referred to VPP Moderate. Prisoners who meet criteria for VPP High, all security levels, and all ERD's will be referred to VPP High. See attachment A: Prisoner Program Grid. All prisoners who are currently enrolled in AOP will remain in that program until completion of the group.

**Sex Offender Programming**

Program criteria for the sex offender population is based on the Vermont Assessment of Sex Offender Risk (VASOR), STATIC-99R and COMPAS assessment tools. Prisoners with a Low VASOR Reoffense score, Low STATIC-99R score, and a Low, Moderate, or High COMPAS Violence Risk score will receive a Psychological Evaluation. Prisoners with a Moderate or High VASOR Reoffense score will receive the SOP 6 month program. See attachment A: Prisoner Program Grid.

Master level clinicians shall administer the STATIC-99R on those prisoners with a Low VASOR Reoffense score, those without a VASOR, or a VASOR that could not be scored. Assessments are also administered to prisoners who have already completed SOP as part of the Administrative Rule that indicates all sex offenders shall have a psychological evaluation. If the STATIC-99R results in a moderate or high score, the prisoner will be placed in the SOP 6 month program. Prisoners who are not currently serving for crimes included on the SOP sex offender crimes list, but who engaged in behavior during one or more of their instant offenses which closely approximated behaviors described in the listed crimes, shall be recommended for assessment.

Facility staff must review program requirements documented in the Offender Management Network Information System (OMNI/RGC tab) for every prisoner upon arrival into the facility. The OMNI/RGC tab shall contain the program recommendations, enrollments, and terminations for T4C, VPP, and SOP. Existing VPP, AOP, and SOP referrals in OMNI that are being replaced by the risk based programming will be removed from the waiting list and documented as such in OMNI by CFA/OOR.

A prisoner who begins, but does not complete an assigned program shall be reassessed for possible re-enrollment into the appropriate program within 90 days of becoming available to again participate. Prisoners who have been assessed, but not admitted into programming and

those who voluntarily terminate from the SO program are to be informed they may request reconsideration. However, such a request for reassessment or readmission must be in writing (prisoner may need assistance) and must clearly indicate what has changed since the prisoner was last assessed or terminated, which now makes him/her suitable for SOP admission. These written requests will be documented in the medical record with a notation showing date of review, reviewer, and whether or not the prisoner was placed back on the program waiting list.

Any staff or Parole Board member may refer any prisoner who is considered to be at significant risk of criminal sexual conduct to be administered a SOP assessment. The Parole Board may also refer prisoners serving life sentences to be assessed. Mental health staff will conduct file reviews and/or interviews with such prisoners as needed, and place those prisoners determined to be suitable for SOP assessment on the waiting list with the approval of the Regional Mental Health Director. Prisoners placed back on the waiting lists shall be reconsidered by their risk, need and Earliest Release Date (ERD). When the request derives from the Parole Board, the Parole Board shall be notified of the decision.

**Programming Identification and Documentation**

Designated CFA/OSA staff shall identify the VPP and SOP waitlist prisoners who meet the criteria for risk based programming and CFA/OSA will enter the referral in the OMNI RGC tab screen for the appropriate program in accordance with this memorandum.

When the prisoner arrives at the receiving facility, designated facility staff shall check the OMNI RGC tab screen for program recommendations to determine which program is required to be completed and ensure that the program facilitator is notified of new program referrals. Dates of enrollment and termination shall be recorded into the OMNI RGC tab by either the program facilitator or other designated facility staff. SOP referrals will continue to derive from Central Office Health Care and will be documented in OMNI RGC tab after July 15, 2012. Prior to that date, all SOP referrals will be documented in the CMIS SAU screen.

Designated facility staff shall track prisoner progress and monitor program enrollments and terminations by updating the OMNI RGC tracking tab with termination date(s), and reason for termination, noting unsatisfactory completions. Staff shall make the appropriate OMNI documentation within one business day of receipt information from the service provider, program facilitator, or mental health staff. When appropriate, OMNI Case Notes may be used and program outcomes must be documented in either a discharge summary or termination report. If the prisoner is past or within 6 months of their ERD, the discharge summary report must be forwarded to the Parole Board Psych mailbox at Parole-Board-Psych@michigan.gov. For all other prisoners, facility staff must ensure copies of the discharge summary report are placed in the Central Office, Institutional Records Office, Counselor files and Prisoner.

CFA Quality Assurance staff shall periodically review a random sample of program referrals to ensure the OMNI RGC tab is being appropriately maintained and take appropriate action to correct the data and staff processes as needed.

For cases which do not otherwise meet the above program criteria, and are believed by Parole

Board staff to be in need of programming, a program placement override request may be initiated. The written request must include the specific program requested and justification for the request. The request must then be approved by the Parole Board Chair, and sent to the BHCS Planning Manager for placement in SOP or to the CFA Programs' Manager for override placement into VPP or T4C. The Parole Board shall be notified of the decision.

BHCS Central Office staff will continue their current practice for SOP program referrals, monitoring, and tracking in the CMIS SAU Screen and then OMNI RGC tab after July 15, 2012. Mental Health Services staff shall forward requests for new groups to the BHCS Central Office Planning Manager. The BHCS Central Office SOP Planning Manager shall process requests for new groups and forward the requests to CFA Classification as necessary.

If you have any questions, please contact Anthony McCloud, Offender Reentry Manager.

cc: Joanne Sheldon, Health Services Administrator
Kathleen Mutschler, Director, Mental Health Services
Denise Allsberry, FOA Administrator
Laura Young, RA
Mike Alexander, RA
Edward E. Mize, Operations Administrator
Bruce Curtis, RPA
Michael Curley, A/RPA
Thomas Combs, Parole Board Chair
Laura Heinritz, Classification Director
Dave Fountain, Parole Board Administrator
Anthony W. McCloud, Offender Reentry Manager