CASE NO. 15-2346/2486

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOHN DOES, #1-5; MARY DOE

*Plaintiffs-Appellants/Cross-Appellees,*

-vs-

RICHARD SNYDER, Governor of the State of Michigan; COL. KRISTE ETUE, Director of the Michigan State Police, in their official capacities,

*Defendants-Appellees/Cross-Appellants.*

**On appeal from the United States District Court for the Eastern District of Michigan**

# BRIEF ON AMICI CURIAE IN SUPPORT OF PLAINTIFF - APPELLEES


VALERIE NEWMAN (P47291)
MICHAEL MITTLESTAT (P68478)
3300 Penobscot Building
Detroit, MI 48226
(313) 256-9833
VNEWMAN@SADO.ORG

N.C. DEDAY LARENE
LARENE & KRIGER, P.L.C.
1717 Penobscot Building
Detroit, MI 48226
(313) 967-0100
d6644@deday.net

OHIO PUBLIC DEFENDER
CRAIG JAQUITH
CHIEF COUNSEL LEGAL DEPARTMENT
250 E. BROAD ST., SUITE 1400
COLUMBUS, OH 43205
(314) 728-9401
CRAIG.JAQUITH@OPD.OHIO.GOV

NACDL
CANDACE C. CROUSE
NACDL AMICUS COMMITTEE SIXTH
CIRCUIT VICE CHAIR
PINALES STACHLER YOUNG BURRELL
& CROUSE CO LPA
455 DELTA AVENUE, SUITE 105
CINCINNATI, OH 45226
(513) 252-2750
ccrouse@pinalesstachler.com

NAPD
JENNIFER M. KINSLEY
DIRECTOR, FIELD PLACEMENT PROG
NORTHERN KENTUCKY UNIVERSITY
SALMON P. CHASE COLLEGE OF LAW
NUNN HALL ROOM 507
HIGHLAND HEIGHTS, KY 41099
(859) 572-7998
KINGSLEY1@NKU.EDU

# TABLE OF CONTENTS


TABLE OF CASES, STATUTES, & AUTHORITIES ............................................i

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

STATEMENT OF *AMICI CURIAE* ..........................................................................1

ARGUMENT ..............................................................................................................4

CONCLUSION.........................................................................................................17

CERTIFICATE OF COMPLIANCE......................................................................18

CERTIFICATE OF SERVICE ...............................................................................19

# TABLE OF AUTHORITIES

CASES

*Missouri v. Frye,* ___ U.S. ___, 132 S.Ct. 139907 (201 .......................................7, 8

*Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002) ..................................14

*Libretti v. United States,* 516 U.S. 29 (1995) ..........................................................14

*Padilla v Kentucky*, 559 U.S. 356 (2010) ..................................................................8

*Palko v. State of Connecticut*, 302 U.S. 319 (1937) ..................................................7

*Saenz v. Roe,* 526 U.S. 489 (1999) ...........................................................................14

*United States v. Barton*, 455 F.3d 649 (6th Cir. 2006)..............................................7

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ....................................................14

STATUTES

M.C.L. 750.520d(1)(a) .........................................................................................10

RULES

Fed. R. App. P. 32(a)(6).........................................................................................18

Fed. R. App. P. 32(a)(7)(B) ....................................................................................18

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Amici Curiae Criminal Defense Attorneys of Michigan, National Association for Public Defense National Association of Criminal Defense Lawyers, and Ohio Public Defender's Office make the following disclosures:

1. Is any said amicus a subsidiary or affiliate of a publicly-owned corporation?

No.

2. Is there a publicly-owned corporation, not an amicus, which has a financial interest in the outcome?

No.

Undersigned counsel certify that no persons and entities as described in the fourth sentence of Fed .R. App .P. 28.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## STATEMENT OF *AMICI CURIAE*

(1) **CDAM**: Since its founding in 1976, Criminal Defense Attorneys of Michigan ("CDAM") has been the statewide association of criminal defense lawyers in Michigan, representing the interests of the state's criminal defense bar in a wide array of matters. It is the state affiliate of NACDL.

As reflected in its by-laws, CDAM exists to, inter alia, "promote expertise in the area of criminal law, constitutional law and procedure and to improve trial, administrative and appellate advocacy," "provide superior training for persons engaged in criminal defense," "educate the bench, bar and public of the need for quality and integrity in defense services and representation," and "guard against erosion of the rights and privileges guaranteed by the United States and Michigan Constitutions and laws." Toward these ends, CDAM regularly conducts training seminars for criminal defense attorneys, publishes a newsletter with articles on various subjects relating to criminal law and procedure, provides relevant information to the state legislature regarding contemplated changes of laws, engages in other educational activities and participates as an amicus curiae in litigation of relevance to the organization's interests. CDAM has a strong, direct institutional interest in this case because of the implications of the trial court's ruling on the constitutional rights of criminal defendants in Michigan.

(2) **NACDL**: The National Association of Criminal Defense Lawyers ("NACDL") is a non-profit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of approximately 9,200 direct members in 28 countries, and 90 state, provincial and local affiliate organizations totaling up to 40,000 attorneys. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL files numerous amicus briefs each year in the Supreme Court, this Court, and other courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole

(3) **NAPD**: The National Association for Public Defense ("NAPD") is a national organization uniting nearly 7,000 public defense practitioners across the 50 states. As public defense experts, NAPD's mission is to ensure strong criminal justice systems, policies and practices ensuring effective indigent defense, system reform that increases fairness for indigent clients, and education and support of public defenders and public defender leaders.

(4) **Ohio Public Defender**: The Office of the Ohio Public Defender is a state agency, designed to represent criminal defendants, adults and juveniles, and to

coordinate defense efforts throughout Ohio. The Ohio Public Defender has litigated several challenges to Ohio's version of the federal Adam Walsh Act's SORNA requirements in the Supreme Court of Ohio and continues to represent adults and juveniles who are subject to SORNA. Like this Court, the Ohio Public Defender is interested in the effect of the law that this case will have on those parties who are, or may someday be involved in, similar litigation. Accordingly, the Ohio Public Defender has an enduring interest in protecting the integrity of the justice system and ensuring equal and fair treatment under the law. To this end, the Ohio Public Defender supports the fair and just treatment of individuals who have been convicted or found delinquent of sexually oriented offenses

Pursuant to Fed .R. App. P. 29(c)(5), *amici* state that no party's counsel authored this brief in whole or in part, and that no party or person other than *amici* and their members contributed money towards the preparation or filing of this brief.

## ARGUMENT

Imposing additional sanctions on previously-convicted criminal defendants by retroactive application of a new law or new reporting is contrary to due process and injects wide spread uncertainty into the plea bargaining process. Such practice makes it difficult if not impossible for defense counsel to advise clients consistently with their Sixth Amendment duties when the rules that drastically increase the consequences of convictions are changed and applied, sometimes long after the plea bargain process is complete.

**The practical effect of retroactive application of reporting requirements**

Anne Yantus, the Plaintiff's expert and a well-known authority on plea and sentencing law and practices in the State of Michigan, explained that sex offender registration "has been a growing area of concern within the criminal justice community, and this is especially true since 2006." R. E. 91-4, Expert Report, ¶ 5, Pg ID 4774. "[I]t is clear to me," Ms. Yantus wrote:

> that sex offender registration is a critical issue for criminal defendants who are charged with sex crimes. The questions of whether a defendant must register, for how long. and whether registration is public or private are often pivotal in resolving cases through plea negotiations.

*Id.*, at ¶ 7, Pg ID 4774. Indeed, according to her testimony, "there will be times where a defendant will give up the opportunity for an acquittal simply to avoid registration." R. E. 90-21, Deposition, p 68, Pg ID 4582.

However, the retroactive application of SORA amendments extending its reach to subsequent nonsexual offenses, and requiring and extending public reporting provisions ("recapture" provisions), have made it exceedingly difficult - frustratingly so - for criminal defense attorneys to address the very important questions of what impact SORA may have on their clients' lives:

> they're frustrated in what they tell their client now about registration may not be true in the future, and, for example, the recapture provision. I mean, when -- before the recapture provision you were pretty safe in saying, you know, if you were convicted of a new felony and it was not sexually related that, you know, you didn't have any danger of having to register, but then the recapture provision came in and suddenly these people would have to register. And, for example, now you may plead a defendant to a crime for which the registration is private but that may not be true in the future, and so negotiating for an offense where it's a private registration may only hold true for a certain number of years, so there's a certain level of uncertainty there.

*Id.,* at pp. 80-81m Pg ID 4585-4586.

**SORA registration plays a significant role in the prosecution's charging decisions and plea negotiations**

Retroactive application of new SORA requirements undercuts what prosecutors sought to achieve through their charging and plea bargaining decisions as well. Michigan's prosecutors are trained in the impact of SORA, and its consequences, as components of the plea and charge bargaining process. This is illustrated by the deposition testimony of Herbert Tanner of the Prosecuting Attorneys Association of Michigan (PAAM), R. E. 90-22, Deposition, Pg ID 4589,

and a 2011 PowerPoint presentation given by Mr. Tanner to prosecutors from across the state. R. E. 92-10, PowerPoint, Pg ID 5050. As to the latter, the stipulated record indicates:

> The PAAM 2011 PowerPoint used to train prosecutors contains a series of hypothetical case studies regarding charging decisions and sex offender registration. Case Study # 1 involves a defendant who cannot join the Marines if he pleads to a registrable offense. The example shows that by pleading to disorderly conduct, registration can be avoided. Case Study #2 involves a situation where "you [the prosecutor] believe the defendant should be punished but you don't believe he should be on the registry." The example discusses which possible convictions will result in Tier I (non-public) versus Tier II (public) registration. Case Study #4 involves an offense that would not result in public registration, and states that by charging separate counts in consecutive complaints, the defendant can be made a Tier II (public) registrant.

R. E. 90, JSOF, ¶ 1037, Pg ID 3974-3975. These case studies illustrate, among other things, the degree to which the prosecution is aware of the real-life impact of SORA, as Mr. Tanner acknowledged:

> Mr. Tanner testified that "there are prosecutors who just like everybody else, who think that there are certain circumstances that would justify not putting someone on the registry, like when the prosecutor thinks the defendant is "a good kid from a good family and [the prosecutor doesn't] want to ruin his life."

*Id.,* at ¶ 1041, Pg ID 3976.

If unanticipated changes to SORA lead to consequences unintended by *prosecutors* in their quest to seek justice, consider what it does to the accused. That a life can be ruined without warning, or that the "ruination" could not be predicted

when important decisions are made by a criminal defendant after consulting with his or her lawyer, are realities of the ever-changing and retroactive application of new SORA laws. These retroactivity issues as applied to those whose convictions are final are antithetical to "the concept of ordered liberty," which is central to our notion of Due Process. *Palko v. State of Connecticut*, 302 U.S. 319, 325 (1937).

**The centrality of plea bargaining in the criminal justice system**

"Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Missouri v. Frye*, ___ U.S. ___, 132 S.Ct. 1399, 1407 (2012). Most pleas are the product of plea or charge bargaining. *See, e.g.* See Dept. of Justice, Bureau of Justice Statistics, *Plea and Charge Bargaining*, Research Summary, p. 3, https://www.bja.gov/Publications/PleaBargainingResearchSummary.pdf, as viewed December 16, 2015.

"[W]hen addressing ex post facto type due process concerns, questions of notice, foreseeability, and fair warning are paramount." *United States v. Barton*, 455 F.3d 649, 654 (6th Cir. 2006). Such questions are central to the voluntariness of a defendant's plea, the adequacy of his or her representation, and, at least as important, to the overall integrity of the process.

In advising clients during the plea bargaining process, attorneys have critical "responsibilities that must be met to render the adequate assistance of counsel that

the Sixth Amendment requires in the criminal process at critical stages." *Missouri v. Frye,* 132 S. Ct. 1399, 1407 (2012). Counsel have a duty to inform clients of the various risks of going to trial, and of the consequences of their convictions, whether by plea or trial. *Padilla v Kentucky*, 559 U.S. 356 (2010)(holding that counsel "must inform her client [of] whether his plea carries a risk of deportation.").

These duties are impossible to fulfill where laws having profound impact on defendants' lives are amended and applied retroactively to them – sometimes decades after their convictions. Such retroactive changes upend the advice given at the plea stage by changing the consequences of the plea, and violate the defendant's right to fairness and due process. Decisions on how to proceed when confronted with a choice between accepting a plea and electing a trial can only be as sound as the advice provided to them about the potential consequences of each course of action.

*Amici* are organizations peopled by and representing practicing lawyers whose day-to-day work and responsibilities reflect these realities. For their members, and their members' clients, the continuing changing face of SORA has had profound real-world impacts, some of which simply could not have been anticipated. This has done real-world violence to their client's expectations of "notice, foreseeability, and fair warning." In these kinds of cases, a Due Process

violation is especially harmful.

**Implications of retroactive application of SORA registration**

Criminal defendants rely on the advice and counsel of their attorneys. This reliance on the advice regarding potential outcomes factors heavily in the plea bargaining context. While it is an unpleasant fact that innocent defendants enter into guilty pleas, it is often the case the doing so significantly mitigates what the defendant believes will ultimately be a negative outcome. Knowing in advance of that decision the certainty of the outcome is imperative to make an informed decision. It is also imperative to a fair and just system.

The stipulated factual record pertaining to plaintiffs John Does ## 1 and 2 vividly illustrates these problems.

**John Doe #1**

As to as to John Doe #1, it is undisputed that there was no sexual component, real or threatened, to his offense conduct. It cannot be disputed that neither he, nor his lawyer, could have anticipated that he would be portrayed to the public at large as a sex offender when his plea to kidnapping and robbery offenses was negotiated and entered.

Only after John Doe #1 served 20 years in prison, transformed his life, and was in the process of successfully completing a term of parole supervision did he learn that, notwithstanding the fact that he had never even been *charged* as a sexual

offender, he would be required to register as one, pursuant to a 2005 amendment to SORA, Mich. Pub. Act 132 Sec. 5(6). That act expanded the reach of registration to persons convicted of kidnaping involving minors.

In 2011, Mr. Doe #1 was again reclassified, this time as a Tier III offender, and required to register and comply with SORA for life. *Id.,* at ¶¶ 54-55, Pg ID 3740.

**John Doe #2**

John Doe #2's case illustrates an egregious injustice involving a defendant who fully expected to have no public criminal record at all when he reached an agreement to plead. This individual plead guilty to third-degree Criminal Sexual Conduct under M.C.L. 750.520d(1)(a), under the Holmes Youthful Trainee Act (HYTA), a youthful-offender provision of Michigan law. *Id.,* at ¶¶ 60-65, Pg ID 3741.

Under HYTA, once the terms of the sentence were successfully completed, that adjudication did not constitute a "conviction", and thus would not appear in any criminal background check. When he pled, John Doe #2 believed, and justifiably so, that any SORA registration would be non-public - *i.e.,*"accessible only to law enforcement." Furthermore, the plea was induced in no small part, by the "prosecutor's promise that his case would be dismissed under HYTA and his records sealed," *id.,* at ¶¶ 71, Pg ID 3743.

But starting in 1997, the information was made available publicly, in a series of more and more accessible forms. *Id.*, at ¶¶ 10, 15, 18, Pg ID 3731-3733. Not only that, but "[i]n 2011, Mr. Doe #2 was retroactively re-classified as a Tier III offender, and he must now register for life." *Id*, at ¶ 85, Pg ID 3745.

Thus, despite the fact John Doe #2 has *no* conviction on his record and fully believed there would be very limited law enforcement access to his history, he is currently listed as "a convicted sex offender on Michigan's sex offender registry," and will be for the rest of his life. *Id.*, at ¶¶ 87-88, Pg ID 3746.

**Effects of retroactive application of SORA on John Does #1 and #2**

These increasingly restrictive, burdensome, and public requirements of SORA have impacted the lives of John Does # 1 and 2 in a variety of significant ways. For example, despite that John Doe #1's crime had nothing to do with the dangers SORA registration seeks to address it is agreed that:

> Although Mr. Doe #1 hopes to go to his son's sporting events and parent teacher conferences as the child grows up, Mr. Doe #1 must weigh this desire to be an involved parent against the risk of being a totally absent parent if he violates SORA: "[B]ut that fear of going back to prison, which one weighs more heavy, me not being involved in their life while I'm out here or me going back to prison.
>
> * * *
>
> Mr. Doe #1 stated that when he was released from prison, he had to live in a half-way house, because he could not live with either his mother or his sister, as they both lived within 1000 feet of a school. He also could not live with another sister or his aunt because the MDOC does not allow registrants to live in homes with children.

Mr. Doe #1 stated that he was rejected by landlords because of his status as a registered sex offender.

* * *

Mr. Doe #1 has repeatedly lost employment opportunities because he is a registered sex offender. When he was first released from prison, he participated in a reentry program designed to help him find employment.

Mr. Doe #1 actively sought work and flagged potential jobs off employment lists, but his case manager told him repeatedly that those employers would not hire registrants. The occupations where he was denied employment included garbage collection and fast food restaurants.

Mr. Doe #1 tried to open his own business as a subcontractor on a home preservation project to restore foreclosed homes. Mr. Doe #1's parole agent required him to close the business because many contracting jobs are within restricted geographic zones.

* * *

*Id.,* at ¶¶ 530-532, 912-913, 938-940, 987, Pg ID 3854-3855, 3944, 3962

As to John Doe #2, the stipulated facts include the following circumstances:

According to Mr. Doe #2, his ability to participate in the upbringing of his daughter is limited because he cannot participate in her school and extra-curricular events. His daughter wants him to go to her basketball games and field trips, but he cannot.

* * *

Doe #2 stated:

He is reluctant to use the Internet because he is concerned that his internet screen names might one day be placed on the public registry website.

* * *

Mr. Doe #2 does not have criminal record and his dismissed HYTA case does not appear on a criminal background check. He attributes his difficulties finding housing to his status as a registrant.

> Even when I tried to get into an apartment, they gave me a readout of why they wouldn't let me live there, and it said national sex offender registry and up under it said, conviction information, none.

Mr. Doe #2 stated that he asked his cousin for a place to stay. His cousin refused, stating that the neighbors would find Mr. Doe #2 on the registry, and would then seek to have both Mr. Doe #2 and his cousin evicted.

Mr. Doe #2 stated that he could qualify for subsidized housing as a disabled military veteran. He identified a program that would have provided him with a Section 8 voucher for his own apartment, but individuals subject to lifetime sex offender registration are barred under federal law from subsidized housing.

* * *

Mr. Doe #2 need not list his sealed HYTA case on job applications asking whether he has a criminal record. However, employers refuse to hire him when they find out that he is on the registry. Due to his registry status he was unable to work as a firefighter, at Home Depot, and in various Department of Defense positions.

* * *

*Id.*, at ¶¶ 533-534, 537-538, 645-646, 914-917, 943-943, 987, Pg ID 3855-3856, 3884, 3944-3945, 3950, 3962.

It is beyond peradventure that these kinds of interests - where one may live and work, where and how one may earn a living and support one's family, the extent one's involvement in the education and upbringing of one's children, the freedom to travel freely - are so fundamental as to implicate Substantive Due Process protections. *See, e.g., Saenz v. Roe*, 526 U.S. 489 (1999); *Washington v. Glucksberg,* 521 U.S. 702, 719-721 (1997); *Meyer v. Nebraska,* 262 U.S. 390 399-400 (1923); *Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002).

The retroactive application of SORA, in derogation of these interests, violates ordinary principles of fundamental fairness. *See,* Plaintiffs' First Brief, pp. 41-47. *Amici* , and their members, are, of course, charged with the day-to-day obligations and responsibilities of safeguarding the interests of their clients, and specifically of advising them of the consequences of some of the gravest decisions they will have to make in their lives. Repeatedly changing the rules creates a consistently-moving target that makes it nearly impossible for them to do this consistently with the requirements of the Sixth Amendment.

As the Supreme Court wrote in *Libretti v. United States,* 516 U.S. 29, 50-51 (1995):

> Apart from the small class of rights that require specific advice from the court . . . it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would forgo.

Responsible criminal defense lawyers cannot take these obligations lightly. Unfortunately, the fluidity of the legal landscape where retroactive application of SORA amendments are concerned has - as the cases of John Doe ## 1 and 2 well illustrate - made it impossible for them to adequately and knowledgeably discharge their duty to inform a defendant of the advantages and disadvantages of a plea agreement.

It would not have been reasonably foreseeable to the lawyers for either John Doe #1 - who counseled a guilty plea to a non-sexual offense - or John Doe #2 - who negotiated a plea that avoided public notice of that conviction - that their clients would wind up publicly identified on Michigan's sex offender registry, charged for the rest of their lives with the obligations and burdens that such registration entails. There is certainly no evidence in the record to suggest that either lawyer could have or did make either client aware of any such possibility, and affirmative evidence that neither Plaintiff was in fact aware of it.

Likewise, counsel for Doe # 5 could not have foreseen that he would become subject to registration three decades after his plea. Counsel for the other Does could not have predicted that their clients would face lifetime registration or

be forced to cope with exclusion zones that severely limit their access to housing and employment.

If the retroactive application of the SORA amendments at issue are upheld, People like the Plaintiffs will be shackled with lifelong burdens - "disadvantages," as the *Libretti* Court put it - as a result of the unforeseeable consequences of plea or charge negotiations and agreements they entered into without the benefit of the kind of advice and counsel they should, in fairness, received. And here, again, the Due Process implications are striking.

As noted previously, it is indisputable that plea and charge bargaining are a large part of the criminal justice system in 21st century America. Unsurprisingly, the record below confirms that the potential impact of SORA registration is a large part of the plea and charge bargaining process, and confirms as well that the potential retroactivity of SORA amendments poses a unique, and uniquely challenging, source of imponderables of the same sort as those faced by John Does #1 & 2.

## CONCLUSION

All notions of due process and fairness in the criminal justice system are destroyed when the system is upended by new laws that are given retroactive effect. Additional sanctions on previously-convicted criminal defendants by retroactive application of a new law or new reporting injects wide spread uncertainty into the plea bargaining process. Such practice makes it difficult if not impossible for defense counsel to advise clients consistently with their Sixth Amendment duties. When the rules that drastically increase the consequences of convictions are changed and applied, sometimes long after the plea bargain process is complete, the result is a fundamental unfairness with no redress.

Respectfully submitted,

BY: */ s / Valerie R. Newman*
Valerie Newman (47291)
/s/ Michael Mittlestat
Michael Mittlestat (P68478)
Criminal Defense Attorneys of Michigan
645 Griswold, Ste. 3300
Detroit, MI 48226
(313) 256-9833
*Attorney for Amici Curiae*

Dated: January 11, 2016

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,459 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in14-point Times New Roman type style.

Dated: January 11, 2016

Respectfully submitted,

*/ s / Valerie R. Newman*
Valerie Newman (47291)
BY: s/Michael Mittlestat
Michael Mittlestat (P68478)
Criminal Defense Attorneys of Michigan
645 Griswold, Ste. 3300
Detroit, MI 48226
(313) 256-9833
*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on January 11, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*/ s / Valerie R. Newman*
Valerie Newman (47291)
BY: s/Michael Mittlestat
Michael Mittlestat (P68478)
Criminal Defense Attorneys of Michigan
645 Griswold, Ste. 3300
Detroit, MI 48226
(313) 256-9833
*Attorney for Amici Curiae*